[Civ. No. 33370. Second Dist., Div. Three. Jan. 17, 1969.]

BEIRUT UNIVERSAL BANK, S.A.L., Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; ORBI, S.A., et al., Real Parties in Interest.

Krystal & Paradise and Monroe B. Krystal for Petitioner.

No appearance for Respondent.

Swerdlow, Glikbarg & Shimer and Richard H. Flourn for Real Parties in Interest.

FORD, P. J.—Petitioner, Beirut Universal Bank, S.A.L., a Lebanese banking association, seeks a writ of mandate to compel the superior court to enter an order quashing service of summons on petitioner. The service was made pursuant to the provisions of section 411, subdivision 2, of the Code of Civil Procedure and sections 6500-6504 of the Corporations Code.[1]

On January 3, 1968, the real parties in interest, Orbi, S.A., a Swiss corporation, and William R. Forman, commenced the present action against petitioner and Selim G. Habib. The relief sought was the rescission of certain agreements and damages for fraud. Service of the summons was made on the Secretary of State on January 18, 1968. On March 11, 1968, petitioner appeared specially and made a motion for an order quashing service of summons on the ground that the court lacked jurisdiction over petitioner. The motion was heard upon affidavits and was denied.

In the first cause of action of the complaint it was alleged that on or about ''December 15 through 20, 1966, in the County of Los Angeles, defendants and plaintiffs negotiated and agreed to certain independent but related oral contracts, portions of which were reduced to writing and signed in Los Angeles on those dates;'' that in one agreement defendant Beirut Universal Bank agreed to lend to Orbi the sum of 500,000 Lebanese pounds to be used by Orbi to purchase 50 percent interest in a motion picture theater business in Beirut, Lebanon, owned by defendant Habib; that the bank also agreed to lend an additional 100,000 pounds to defendant Habib; that the bank expressly represented and agreed that the 600,000 pounds would be used for specified purposes; that

---

[1] In section 411, subdivision 2, of the Code of Civil Procedure, it is provided that in an action against a foreign corporation, doing business in California, summons must be served by delivering a copy thereof in the manner set forth in sections 6500 to 6504, inclusive, of the Corporations Code. In the present case, the plaintiffs had recourse to the provisions of section 6501 of the Corporations Code and service was made on the Secretary of State.

the bank made those representations and entered into the agreement ''without ever intending to perform or carry them out;'' that in reliance upon those representations and that agreement, plaintiff Orbi executed a letter of commitment (a copy of which was attached to the complaint as exhibit A) and plaintiff Forman ''did execute in Los Angeles at the same time a guaranty of the payments of all amounts due to the Beirut Bank from Orbi'' (a copy of which was attached to the complaint as exhibit B); that prior to entering into the oral agreement alleged in the first and second causes of action and executing the documents (copies of which were attached to the complaint as exhibits A, B and C, respectively) the defendants were aware that the theater premises had been seized by the landlord because of the nonpayment of rent by defendant Habib and defendants failed to disclose the fact of such seizure prior to the making of the ''aforesaid agreement;'' that if plaintiffs had been informed of that fact they would not have entered into the ''agreement described in this count and in the Second Count;'' that in breach of the oral agreement heretofore described, the defendant bank never paid any of the obligations owed by defendant Habib ''on said theatre to parties other than said bank;'' and that ''plaintiffs hereby rescind said oral agreement and Exhibits A and B hereto on the ground that their consent thereto was obtained through the fraud of defendants . . . and on the further ground that the consideration therfor has failed . . . .''

In the second cause of action the plaintiffs sought rescission of the contract with defendant Habib (exhibit C).

The third cause of action embodied by reference specified paragraphs of the first and second causes of action. In addition it was alleged: ''The representations described in paragraph 5 above [as to the disposition to be made by the bank of the proceeds of the loan] were made by both Rudolph Manasterski, an officer of defendant Beirut Bank, and also by defendant Habib during extensive negotiations with Pat Notaro, Orbi's president, and plaintiff Forman, in Los Angeles, California, during the period December 15 to December 20, 1966, Habib being present during all these days and Manasterski being present on the 16th, 19th and 20th.'' It was further alleged that the defendants, in making such representations, knew that the representations were false and ''never intended that Beirut Bank perform same, but, rather, always intended to have plaintiffs rely thereon (and plaintiffs

did rely thereon), thereby intending to defraud plaintiffs into becoming liable for the payment to defendant Beirut Bank of L.£. 600,000, L.£. 550,000 of which was used to satisfy Habib's antecedent debt to said defendant, which payment could not conceivably benefit plaintiffs." It was also pleaded that the plaintiffs relied on the false representations in entering into the agreement.

In support of its motion to quash, the petitioner Beirut Universal Bank filed the affidavit of its president, Rudolph Manasterski. He was a Lebanese citizen residing in Beirut, Lebanon. He stated that the bank had never maintained any office in California and had never owned any property in this state. An officer or representative of the bank had never been present in this state and the bank had not engaged in any business transaction in California by means of correspondence, cable or otherwise, except as hereinafter related.

With respect to the inception of the transaction involved in the present action, Mr. Manasterski stated that in November 1966 defendant Habib visited the bank in Beirut and talked to Mr. Khoury, an officer of the bank, about the matter of making a loan to certain parties who were interested in purchasing a 50 percent interest in Mr. Habib's theater business in Beirut. Habib was then indebted to the bank in the sum of 550,000 Lebanese pounds with respect to that business. A few days thereafter, Pat R. Notaro, an officer of plaintiff Orbi, S.A., a Swiss corporation, acting on Orbi's behalf, discussed with Mr. Khoury and Mr. Manasterski the matter of lending to Orbi the sum of 500,000 Lebanese pounds for the purpose of such purchase. Mr. Manasterski stated that such a loan could be made if an acceptable personal guaranty of the loan could be obtained. Mr. Notaro suggested plaintiff Forman as such guarantor and the bank advised Mr. Notaro that Mr. Forman's guaranty would be acceptable. Mr. Habib's indebtedness to the bank was discussed and it was agreed that the proceeds of the loan would be applied against the indebtedness of Mr. Habib to the bank.

A further portion of Mr. Manasterski's affidavit was as follows: "Thereafter, at the request of Notaro, the undersigned came to Los Angeles, California, arriving on December 16, 1966. On December 16, 1966 and on December 17, 1966, the undersigned had conversations with Notaro and Habib concerning the proposed loan to Orbi. No conversations were had by the undersigned with any of the parties involved in this transaction on December 18, 1966. On December 19, 1966, the

undersigned met with Forman, Notaro and Habib. This meeting was held in the office of Forman at 141 South Robertson Boulevard, in the City of Los Angeles. At this meeting, Notaro, on behalf of Orbi, requested that the proposed loan be increased to L.£ 600,000. The undersigned thereupon telephoned the Bank in Beirut and was advised that the increased loan was feasible provided Forman would give the Bank a full guarantee. To expedite the actual making of the loan in Beirut, the undersigned produced a written form of open loan commitment of the type conventionally used in Lebanon which was thereupon signed by Notaro on behalf of Orbi and by the undersigned on behalf of the Bank to become effective if, as, and when the Bank should receive in Beirut the written guarantee of Forman in form acceptable to the Bank. Said written loan commitment was 'open' in that the amount of the loan was not specified therein but left to the convenience and absolute discretion of the Bank. Said open loan commitment provided that it should be performed in and governed by the laws of Lebanon. At this time there was also delivered to the undersigned, to become effective and to be used when Forman's guarantee should be received by the Bank in Beirut, a Lebanese bank form check drawn by Notaro for and on behalf of Orbi in the sum of L.£ 600,000 Lebanese pounds payable to 'self' and a written authorization from Notaro, on behalf of Orbi, to the Bank to apply said sum to the credit of Habib at the Bank. Copies of the aforesaid documents are hereto attached marked Exhibits A, B, and C respectively and by reference thereto incorporated herein.''

Mr. Manasterski further stated in his affidavit that the meeting in Los Angeles on December 19, 1966, terminated prior to noon and that there were no further meetings in California in connection with the transaction which were attended by any representative of the bank. Subsequent to the termination of the meeting on December 19, 1966, Mr. Manasterski had no conversations or transactions with anyone in the State of California in connection with the loan or any other business matter. He left the County of Los Angeles for Beirut on or about December 21, 1966. Thereafter Mr. Forman's guaranty (exhibit B to the complaint) was delivered to the bank in Beirut by Habib accompanied by a letter from Notaro dated December 21, 1966.[2]

---

[2]The letter from Mr. Notaro to Mr. Manasterski (exhibit D to Mr. Manasterski's affidavit) was on Mr. Notaro's letterhead bearing the

The plaintiffs filed declarations of Mr. Notaro and Mr. Forman and an affidavit of Mr. Habib in opposition to the motion to quash the service of summons. With respect to the meetings in California, portions of Mr. Notaro's declaration were as follows: "I met with Mr. Habib on December 15, 1966 in Los Angeles and with both Mr. Habib and Mr. Manasterski on the 16th, 19th and 20th of December 1966 in Los Angeles. During the course of these meetings, I was presented with certain documents in French by Mr. Manasterski. I informed him I would not sign any documents in French, nor would Mr. Forman, and requested that they be translated. Thereafter, I was presented with English translations thereof. All of the documents which, in part, set forth all of the agreements between the parties to this action were signed in Los Angeles, California, during the period December 16 through 21, 1966. . . . Mr. Forman signed the guarantee agreement on December 21, 1966, after it was translated, and it was given by me to Mr. Habib to give to Mr. Manasterski."

A counteraffidavit of Mr. Manasterski was filed. A portion thereof was as follows: "At the meeting held in Mr. Forman's office on December 19, 1966, an English translation of the guarantee which defendant, Beirut Universal Bank (the Bank), required of Mr. Forman was presented to him. Mr. Forman stated that it was unacceptable to him in its present form; that he would make changes which he desired and send it to Beirut with Mr. Habib. It was then agreed that the loan would be made when the guarantee in form acceptable to the Bank should be received by it in Beirut and that the Bank would not be bound in any respect until then. This guarantee was changed by Mr. Forman and was later delivered to the Bank in Beirut by Mr. Habib. These changes were explained

---

address of 141 So. Robertson Boulevard, Los Angeles, California. The first three paragraphs thereof were as follows:

"Selim will turn over to you the guarantee signed by Mr. William Forman that you requested. You will note that a change was made wherein Mr. Forman insisted that the first notice for payment of the Orbi S.A. loan would be sent to Orbi S.A., Paris, with a copy to Mr. Forman in Los Angeles. If the obligation is not taken care of within thirty days by Orbi, then a second notice will be sent to Mr. Forman in Los Angeles to cure this obligation within thirty days.

"This is common practice on all guarantees in American and European banks.

"This change was made so that there would be no loss of time in the event the first notice was sent to Mr. Forman and he should be out of the country, it would be difficult to notify him of said notice. Therefore, if the first notice is sent to Orbi, which will naturally come to my attention, then all problems can be solved quickly."

in the letter dated December 21, 1966, written by Mr. Notaro to Mr. Manasterski . . . . When this guarantee was received by the Bank in Beirut, the proceeds of the loan in the sum of L.£ 600,000 was placed to the credit of Mr. Habib at the Bank pursuant to the draft and letter attached as Exhibits B and C to my [first] Affidavit . . . ."

In *Fisher Governor Co.* v. *Superior Court,* 53 Cal.2d 222, at page 224 [1 Cal.Rptr. 1, 347 P.2d 1], the Supreme Court stated: "Code of Civil Procedure, section 411, subdivision 2, authorizes service of process on foreign corporations that are 'doing business in this State.' 'That term is a descriptive one that the courts have equated with such minimum contacts with the state "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " (*International Shoe Co.* v. *Washington,* 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057].) Whatever limitation it imposes is equivalent to that of the due process clause. " '[D]oing business' within the meaning of section 411 of the Code of Civil Procedure is synonymous with the power of the state to subject foreign corporations to local process." (*Eclipse Fuel etc. Co.* v. *Superior Court,* 148 Cal.App.2d 736, 738 [307 P.2d 739]. . . .)' (*Henry R. Jahn & Son* v. *Superior Court,* 49 Cal.2d 855, 858-859 [323 P.2d 437]; *Carl F. W. Borgward, G.M.B.H.* v. *Superior Court,* 51 Cal.2d 72, 75 [330 P.2d 789]; *Cosper* v. *Smith & Wesson Arms Co., ante,* p. 77, 82 [346 P.2d 409].)' "

▇ Whether a foreign corporation was doing business within California so that jurisdiction may be constitutionally exercised depends upon the circumstances of the particular case. (*Empire Steel Corp.* v. *Superior Court,* 56 Cal.2d 823, 831 [17 Cal.Rptr. 150, 366 P.2d 502].) A relevant factor is the extent to which the cause of action arose out of local activities on the part of the defendant corporation. (*Fisher Governor Co.* v. *Superior Court, supra,* 53 Cal.2d 222, 225-226; *Long* v. *Mishicot Modern Dairy, Inc.,* 252 Cal.App.2d 425, 429 [60 Cal.Rptr. 432].) ▇ As pointed out in the *Empire Steel* case (56 Cal.2d, at page 832) in answer to the argument that continuous activity resulting in substantial contact is necessary before a foreign corporation may be said to be doing business in this state, "the analysis of the activities of a foreign corporation should not be considered merely quantitatively, but in terms of their 'quality and nature,' and their connection with the obligations sued upon." ▇ An isolated transaction may be sufficient to justify a determination

of the existence of jurisdiction. (*Long* v. *Mishicot Modern Dairy, Inc., supra,* 252 Cal.App.2d 425, 428-429, 431-432.)

In the consideration of an order made on affidavits or declarations involving the decision of a question of fact, the appellate court is bound by the same rule as is applicable where oral testimony is presented for review. If the evidence is conflicting, it will be presumed that the court found every fact necessary to support its order that the evidence would justify. (*Detsch & Co.* v. *Calbar, Inc.,* 228 Cal.App.2d 556, 563 [39 Cal.Rptr. 626].)

The affidavits of Mr. Manasterski and the declaration of Pat Notaro furnish ample support for the inference that, while the negotiations for the loan from the bank had been initially undertaken earlier in 1966, the matter was brought to a head and the terms were agreed upon in the meetings which took place in California in December of 1966. It is true that the guaranty was altered by Mr. Forman before he signed it and that shortly after the meetings in Los Angeles it was given to Mr. Habib by Mr. Notaro to be delivered to the bank in Beirut. But the change made in the guaranty related only to the matter of notice and, as set forth in Mr. Manasterski's counteraffidavit, upon receipt of the guaranty by the bank the proceeds of the loan were placed to the credit of Mr. Habib pursuant to the draft and written authorization signed in California by Mr. Notaro on behalf of Orbi. Thus the transaction was substantially arranged in its final form in the course of the meetings in California. Such activity constituted substantial contacts in California in relation to the transaction as to which the plaintiffs now seek rescission or the award of damages for fraud alleged to have occurred in the course of the California meetings. It is true that defendant bank will be put to expense in having to litigate the matter in California, but the current means of transportation and communication render that burden of far less moment than in former times. Inconvenience to the defendant is, of course, a relevant matter, but there is no constitutional requirement that the hardship involved in conducting litigation in a distant place must always be borne by the plaintiffs. (*Empire Steel Corp.* v. *Superior Court, supra,* 56 Cal.2d 823, 834.)

A determination that the defendant bank's activity in December 1966 constituted the doing of business, however, must be viewed in the light of the statutory provisions with respect to the service of summons on foreign corporations. It

has been stated broadly that it is necessary that the foreign corporation be doing business within the state at the time the summons is served. That rule has been said to be subject to a qualification expressed in section 6504 of the Corporations Code as follows: "A foreign corporation which has transacted *intrastate business* in this State and has thereafter withdrawn from business in this State may be served with process in the manner provided in this chapter in any action brought in this State *arising out of such business,* whether or not it has ever complied with the requirements of Chapter 3 of this part." (Italics added.) In section 6203 of the Corporations Code "transacting" intrastate business is defined as "entering into repeated and successive transactions of its business in this State, other than interstate or foreign commerce." (*Detsch & Co.* v. *Calbar, Inc., supra,* 228 Cal.App.2d 556, 566-567.) In *Detsch,* at page 567, the court stated: "Since statutory authority is a necessary basis for service upon a foreign corporation [citations] and since California law provides for service only on withdrawn corporations which have transacted *intra*state business (Corp. Code, § 6504; see generally 22 Cal. Jur.2d 467), a foreign corporation engaged solely in *inter*state commerce which ceases 'doing business' here before it is served with process, is thereby able to avoid suit in this state."

In the present case the transaction which was substantially brought into being in Los Angeles contemplated a continuing relationship of the parties until the loan should be liquidated. Notice of default was to be given to the guarantor, Mr. Forman, at his California address. If the activity of the bank in California while Mr. Manasterski was present constituted the doing of business for purposes of jurisdiction, it is not reasonable to hold that such jurisdictional effect lost all vitality with respect to the transaction involved in the activity which brought it into being as soon as Mr. Manasterski left California. For reasons which will be stated, the use of the words "doing business in this state" in subdivision 2 of section 411 of the Code of Civil Procedure does not compel such a narrow interpretation.

It was stated in *Select Base Materials* v. *Board of Equalization,* 51 Cal.2d 640, at page 645 [335 P.2d 672] : "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] Moreover, 'every statute should be construed with reference to the whole system of law

of which it is a part so that all may be harmonized and have effect.' [Citation.] If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.] Such purpose will not be sacrificed to a literal construction of any part of the act.''

Since the concept of doing business embodied in section 411 of the Code of Civil Procedure is synonymous with the power of the state to subject foreign corporations to local process (*Fisher Governor Co.* v. *Superior Court, supra,* 53 Cal.2d 222, 224), it logically embraces the situation where, as in the present case, the contacts of the foreign corporation in this state in an isolated transaction were sufficient to sustain jurisdiction as to causes of action arising out of that transaction. The present language of subdivision 2 of section 411 stems from the amendment of that section in 1931, but the manner of service of summons is now that designated in sections 6500-6504 of the Corporations Code rather than in former section 406a of the Civil Code. In light of the departure from the presence test of jurisdiction and the adoption of the test now in effect as set forth hereinabove (See *Henry R. Jahn & Son* v. *Superior Court, supra,* 49 Cal.2d 855, 860; Note, 73 Harv. L.Rev. 909, 998-999), it is sound to construe the provisions of subdivision 2 of section 411 of the Code of Civil Procedure in accordance with the expanded concept of the due process clause of the United States Constitution. (See Note, 73 Harv.L.Rev. 909, 1001-1002.)[3]

 The determination that the defendant bank's motion to quash service of summons was properly denied is not

---

[3]In Traynor, *Is This Conflict Really Necessary?* (1959) 37 Tex.L.Rev. 657, at pages 658-659, it was stated: ''. . . there is a net gain of jurisdiction available to states in the modern concept of due process that envisages not only minimum contacts as a primary basis of jurisdiction but also fair notice and opportunity to be heard as the primary tests for valid service. Most states have not yet begun to exercise this jurisdiction. In part the fault lies with statutes that have not kept pace. Even antiquated statutes, however, may be so geared to the due process clause of the United States Constitution as to lend themselves to interpretation in accord with the mutations in that clause. One might note by way of illustration how the California courts have interpreted an 1872 statute authorizing service of process on foreign corporations doing business in the state. [Reference is then made in a footnote to the cases of *Carl F. W. Borgward, G.M.B.H.* v. *Superior Court,* 51 Cal.2d 72, and *Henry R. Jahn & Son* v. *Superior Court,* 49 Cal.2d 855.] They have reasoned that doing business was adopted as a test not for immunity but for jurisdiction, consonant with the then tenor of the due process clause. Any test of jurisdiction geared to its then tenor and expressed in pliant language was therefore no more than illustrative of service of process in accord with the jurisdictional concepts of that period. As those concepts became more flexible the courts found that the wording of the 1872

affected by the following provision in the agreement between the bank and Orbi: "For the execution of the present contract, of the Annexes and all undertakings resulting from them the Borrower declares: . . . B) To abide also to the laws and regulations in force in Lebanon with respect to the payment of any amount of money due by him to the Lender for whatever reason, and to accept the jurisdiction of the Courts of Beirut, as having sole jurisdiction for settling all conflicts arising out of this contract, and to refrain from raising any exception for default of jurisdiction for whatever reason." That agreement, made in advance of the controversy, did not divest the courts of California of jurisdiction in the present case. (See 12 Cal.Jur.2d, Contracts, § 95, p. 295; 13 Cal.Jur.2d, Courts, § 91, p. 603; Note, 56 A.L.R.2d 300, 306.) Corbin states the general rule as follows: "It is a generally accepted rule in the United States that an express provision in a contract that no suit shall be maintained thereon, except in a particular court or in the courts of a particular county, state or nation, is not effective to deprive any court of jurisdiction that it otherwise could have over litigation based on that contract." (6A Corbin on Contracts (1962) § 1445, p. 477.)

The alternative writ is discharged and the peremptory writ denied.

Moss, J., concurred.

COBEY, J.—I concur. Jurisdiction under Code of Civil Procedure, section 411, subdivision 2, over a foreign corporation, which has done nonintrastate business in this state, is constitutional in extent. (See *Carl F. W. Borgward, G.M.B.H.* v. *Superior Court,* 51 Cal.2d 72, 75-77.) It is not the statutorially limited jurisdiction which obtains when the withdrawn foreign corporation formerly transacted only intrastate business here. (See Corp. Code, §§ 6203, 6408, subd. (a), 6504; *U.S. Cap & Closure, Inc.* v. *Superior Court,* 265 Cal.App.2d 408, 410-411 [71 Cal.Rptr. 184]; *Confidential, Inc.* v. *Superior Court,* 157 Cal.App.2d 75, 80 [320 P.2d 546].)

---

statute yielded a correspondingly flexible meaning. Thus in the given case it covered the local activity of the corporation because that activity gave rise to the cause of action. It is worth noting that 'doing business' would probably call for greater local activity if the cause of action were not local."