Richard E. HITT, Plaintiff,

v.

NISSAN MOTOR COMPANY, LTD.,
et al., Defendants.*

No. 74–1647–Civ–CA.

United States District Court,
S. D. Florida.

July 21, 1975.

* Consolidated with: *Supreme Title Co. v. Nissan Motor Co., Ltd.,* 74–1652–Civ–CA; *Novak v. Same,* 74–1671–Civ–CA; *Eakles v. Same,* 74–1697–Civ–CA; *Ingram v. Same,* 74–1698–Civ–CA; *Riley v. Same,* 75–3–Civ–CA; *Sanderson v. Same,* 75–8–Civ–CA; *Kleinman v. Same,* 75–13–Civ–CA; *Jackson v. Same,* 75–15–Civ–CA; *Chesler v. Same,* 75–61–Civ–CA; *PDQ, Inc. of Miami v. Same,* 72–1159–Civ–CA; *Scharf v. Nissan Motor Corp. in U. S. A.,* 73–121–Civ–CA.

Sager & Burns, Miami, Fla., for plaintiff.

Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for defendants.

MEMORANDUM OPINION AND ORDER DENYING MOTIONS OF DEFENDANT NISSAN MOTOR COMPANY, LTD. TO QUASH SERVICE AND DISMISS THE COMPLAINTS FOR LACK OF IN PERSONAM JURISDICTION AND VENUE

ATKINS, District Judge.

This matter is before the Court on Motions of defendant Nissan Motor Company Ltd. (Nissan Japan) to quash service and dismiss the complaints for lack of in personam jurisdiction and venue in all above captioned actions [1] with the exception of the New York action ** [*Scharf v. Nissan Motor Co., Ltd., et al.*, 73–121–Civ–CA], the two New Jersey actions [*Supreme Title Co. v. Nissan Motor Company, Ltd., et al.*, 74–1652–Civ–CA and *P. D. Q., Inc. and Scharf v. Nissan Motor Company, Ltd.*,

1. All the above captioned actions except *P. D.Q. Inc. v. Nissan Motor Co., Ltd., et al.*, 72–1159–Civ–CA were transferred to this court under 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings.

** Nissan-Japan is not a named party in the New York action.

74-1543-Civ-CA] and the Minnesota action [*Chesler v. Nissan Motor Company, Ltd., et al.,* 75-61-Civ-CA].

■ Defendant Nissan-Japan does not challenge the service of process in any of the subject actions except the California action [*Ingram v. Nissan Motor Co., Ltd. et al.,* 74-1698-Civ-CA] and the Missouri action [*Hitt v. Nissan Motor Co., Ltd., et al.,* 74-1647-Civ-CA]. The dispute as to service of process may be disposed of promptly.

In each of these actions, the summons and a copy of the complaint were served personally on Nissan-Japan in care of Frederick W. Rose, registered agent, 794 Broad Street, Newark, New Jersey, and mailed to the President of defendant Nissan-Japan, 6—Chome, Chuo Ku, Tokyo, Japan, by registered mail return receipt requested and the returns have been received by the California and Missouri Courts. Therefore, since § 12 of the Clayton Act [15 U.S.C. § 22 (1970)], supplemented by Rules 4(d)(3), 4(e), and 4(i)(1)(D), F.R.Civ.P., authorize service in this manner, service of process was proper in the California and Missouri actions.

## VENUE

Section 12 of the Clayton Act, 15 U.S.C. § 22 [1970] contains the provisions for venue and service of process in private antitrust actions and it provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts

business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

Section 12, in its present form, was enacted in 1914 to enlarge the venue and jurisdiction provisions of Section 7 of the Sherman Act. It added the phrase "transacts business" to the already existing criteria "found" or "doing business."[2]

■ The phrase "transacts business" has been given a liberal construction in line with the Congressional policy of enabling a person allegedly injured by violations of the antitrust laws to have redress in his home district.[3] Consequently, fewer local contacts are necessary to find that a corporation is transacting business under Section 12 than doing business under the former Section 7 of the Sherman Act.[4] The test for venue under Section 12 is the practical everyday business or commercial concept of doing or carrying on business of any substantial character.[5]

Substantiality of business is to be valued from the standpoint of the average businessman rather than that of the corporate giant to avoid the situation whereby "a large corporation could, with impunity, engage in the same act which would subject a smaller corporation to jurisdiction and venue.[6] Thus, the Congressional intent was to substitute "practical, business conceptions for the previous hair splitting legal technicalities."[7]

In 1948, the United States Supreme Court · in *United States v. Scophony*

2. See the legislative history of § 12 as summarized in *United States v. National City Lines,* 334 U.S. 573, 582–88, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) ; *Eastland Construction, Inc. v. Keasbey & Mattison Co.,* 358 F.2d 777, 780–81 (9th Cir. 1966) ; *B. J. Semel Assoc., Inc. v. United Fireworks Mfg. Co., Inc.,* 122 U.S.App.D.C. 402, 355 F.2d 827, 831 n. 6 (1965).

3. *United States v. Scophony Corp. of America,* 333 U.S. 795, 808, 68 S.Ct. 855, 92 L.Ed. 1091 (1948).

4. *Friedman v. U. S. Trunk Co.,* 30 F.R.D. 148, 150 (S.D.N.Y.1962), *citing Scophony, supra,* and *Eastman Kodak Co. v. Southern Photo Co.,* 273 U.S. 359, 373, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

5. *Scophony, supra,* 333 U.S. at 807–808, 68 S.Ct. 855, 92 L.Ed. 1091.

6. *Green v. U. S. Chewing Gum Mfg. Co.,* 224 F.2d 369, 372 (5th Cir. 1955).

7. *Scophony, supra,* 333 U.S. at 808, 68 S.Ct. 855 at 862, 92 L.Ed. 1091.

*Corp. of America, supra,* held that a British corporation was both "found" and "transacting business" in the New York district within § 12 of the Clayton Act and there was no due process violation in finding that there was jurisdiction over the British corporation. *Scophony* was a civil antitrust proceeding based upon alleged violations of Sections 1 and 2 of the Sherman Act. Due to problems with exporting currency out of England during wartime, Scophony, Ltd., was unable to continue development, manufacture and sale of television equipment in England. Consequently, through a series of contractual arrangements with existing American corporations, Scophony, Ltd., a British corporation, formed American Scophony to exploit the American market, utilize Scophony, Ltd.'s patents and sell its products. Shareholder Scophony, Ltd. retained the right to choose three of five directors and the President, Vice-President and Treasurer of American Scophony. The American shareholder corporations were allowed to choose two of the five directors and the Secretary and Assistant Secretary of American Scophony but the presence of one of these two directors was necessary for a quorum. Hence, the minority shareholder American corporations retained a veto power over the operations of American Scophony which eventually led to a corporate deadlock. Scophony, Ltd. originally had intended to establish itself in the United States as a manufacturer and seller of television equipment but when that plan failed it turned to licensing and exploiting its patents by a means described by the Court as a joint adventure with other companies. It was through these activities described as a "continuous course of business" within the district that the Su-

preme court held that Scophony, Ltd. was "transacting business" of a substantial character. *Id.* 333 U.S. at 810, 68 S.Ct. 855, 92 L.Ed. 1091. The Court also noted that agents of Scophony, Ltd. were present within the district to carry on the British corporation's affairs related to resuscitating its business and putting it on a normal course again. The Court noted that when the entire course of events was viewed as a whole, Scophony, Ltd. had not created and maintained American Scophony as an investment but merely as another means of transacting business in the United States. Since Scophony, Ltd.'s ultimate objective of exploiting the American market had remained the same, the Court decided that a mere change in the methods of achieving this objective did not serve to isolate the company from jurisdiction or process under the antitrust laws. *Id.*, 333 U.S. at 810–811, 68 S.Ct. 855, 92 L.Ed. 1091.[8]

■ *Scophony, supra,* is helpful in analyzing the element of control. In *Scophony,* the minority shareholders [American corporations] retained a veto power over the operations of American Scophony since one of the directors chosen by the American corporation was necessary for a quorum and consequently, Scophony, Ltd.'s stock control was far from complete. No such countervailing force is present in the case *sub judice.* Nissan-Japan is the 100% owner of Nissan-USA and thereby chooses Nissan-USA's entire board of directors who in turn select all of its officers. Furthermore, there has been a significant exchange of officers and directors and overlap of directors between Nissan-Japan and Nissan-USA during the jurisdictional period. [See jurisdictional facts below]. American Scophony was established to exploit the American

8. The *Scophony* Court cited with approval the dicta in *Eastman Kodak, supra,* note 4, that a company engaged in an entirely interstate business with agents who do not reside in the district may still "transact business" within the district under the § 12 test. In that antitrust case, Eastman Kodak was held to have "transacted business" within the Georgia district by virtue not only of selling and shipping its goods to dealers within the district but also by demonstrating its products and soliciting orders through the presence of its salesmen in the district.

market when Scophony, Ltd. could no longer directly engage in business in this country. Nothing prevented Nissan-Japan from entering the American market through a selling branch or department but instead it formed Nissan-USA to serve as exclusive distributor of manufacturer Nissan-Japan's products in the continental United States. Thus, Nissan-USA is a mere conduit or vehicle for entering and exploiting the American market. Nissan-Japan, like Scophony, Ltd., does not control the day-to-day activities of its American subsidiary. However, Nissan-Japan, like Scophony, Ltd., does have representatives within the districts. It is a distinction without merit that the representatives of Scophony, Ltd. were cloaked with significant powers to effectuate the goals and purposes of Scophony, Ltd. within the district while those of Nissan-Japan are of a lesser stature within that corporation. The representatives of Nissan-Japan within the forums were still not merely shareholders' or investors' agents seeking information for the purposes of dealing with the stock but were present on a continuing basis to give Nissan-USA technical advice directly related to the sales and servicing of Nissan-Japan's products in the United States. Indeed, Nissan-Japan has provided an automotive engineer for whom space was furnished by Nissan-USA in its Carson, California headquarters as a "courtesy" to Nissan-Japan. Further, Nissan-Japan had technical employees in the United States who gave advice on "technical questions" to Nissan-USA. At least thirteen officers and/or employees of Nissan-Japan resided in the United States while receiving salaries from Nissan-Japan. Thus, due to the sphere of control exercisable over Nissan-USA by Nissan-Japan, the exchange of officers and employees, and the common directors during the jurisdictional period, the § 12 venue test as applied in *Scophony* is met. Accordingly, Nissan-Japan was "transacting business" within the forums under § 12 of the Clayton Act.

Interestingly, the *Scophony* Court appeared to strain to distinguish the "manufacturer-seller" cases like *Cannon, supra,* which involved the restrictive "presence" or "doing business" standard[9] no longer the test for venue under § 12 at the time *Scophony* was decided. This was necessitated since the more restrictive standard was and still is the test for service under § 12. Because service is not presently at issue, it is unnecessary for this Court similarly to strain to distinguish such cases because the less restrictive "transacts business" venue language is the standard presently being applied. This Court does hold, however, that Nissan-Japan was transacting business under § 12 during the jurisdictional period because Nissan-Japan's hold over Nissan-USA was sufficient to influence and control those decisions which might involve violations of the antitrust laws.[10] With this test the Court adopts the reasoning

9. The *Scophony* Court distinguished manufacturing and selling cases such as *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) by stating that Scophony, Ltd. originally pursued manufacturing and selling but then shifted to a mode of exploiting patents by complex working arrangements in the nature of a joint adventure with others requiring "constant supervision and intervention beyond normal exercise of shareholders' rights by the participating companies' representatives . . . ." *Id.,* 333 U.S. at 816, 68 S.Ct. at 866.

10. *See Flank Oil Co. v. Continental Oil Company,* 277 F.Supp. 357 (D.Colo.1967), which distinguished *Cannon Mfg. Co. v. Cudahy Packing Co., supra,* and its progeny as not applying to antitrust cases. *Id.* at 364. Although *Flank* involved an antitrust suit against Jersey Standard, a holding company, "the nerve center of a petroleum empire," which was held to be "found" and "transacting business" due to its close relationship with its wholly owed subsidiary Humble Oil & Refining Co., this Court sees no reason to distinguish a holding company situation from a manufacturer-seller situation, like the present case, when the medium by which the parent manufacturing company is causing substantial quantities of its motor vehicles, parts and accessories to reach the American

of *Flank Oil Co. v. Continental Oil Co.*[11] Accordingly, the Court also rejects the reasoning of antitrust cases like *Berkman v. Ann Lewis Shops*, 246 F.2d 44 (2nd Cir. 1957) which adopt the *Cannon, supra,* rationale that the applicable test is that venue is present when the parent corporation controls the day-to-day activities of its subsidiary or fails to maintain the requisite degree of corporate separateness between the parent and its subsidiary. While this may place certainty into an area which is riddled with uncertainties, it hardly justifies virtual immunity from an antitrust suit in circumstances such as that exemplified by the case *sub judice.*

There is still another line of cases which supports the conclusion that Nissan-Japan is "transacting business" within the forum districts under § 12 of the Clayton Act. The first such case is *Eastman Kodak Co. v. Southern Photo Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), in which Eastman Kodak Company was held by the Supreme Court to have "transacted business" within the Georgia district by selling and shipping its goods to dealers within the district, by selling within the district by its salesmen who did not reside within the district, and by demonstrating Kodak products within the district. The

Court, in holding that venue was present under § 12 made it clear that under the old § 7 of the Sherman Act, suit could not be brought in Georgia because Kodak did not "reside" or was not "found" there. *Id.* 273 U.S. at 371, 47 S.Ct. 400, 71 L. Ed. 684.

In *Hartley & Parker, Inc. v. Florida Beverage Corporation*, 307 F.2d 916 (5th Cir. 1962), the Fifth Circuit Court of Appeals held that American Distilling which distilled, sold and shipped packaged alcoholic beverages throughout the United States "transacts business" within the Southern District of Florida under § 12 even though American Distilling maintained no office or plant in Florida. Pivotal were that the alcoholic beverages were shipped, sold and delivered into southeast Florida for sale to and consumption by the public in Dade and other counties and the substantial revenue or sales of American Distilling from this activity during the period in question. Of apparently no significance were American Distilling's "missionary or good will" men who were in the district to promote the sale of American Distilling's products since the Court indicated that venue was proper regardless of their presence within the forum. *Id.* at 918. *See also Green v. U. S. Chewing Gum Mfg. Co.*[12]

market is by setting up its wholly owned subsidiary as exclusive distributor of its products within the United States. It does appear that there was more evidence of formal lines of control in the *Flank* case than in the case *sub judice.* However, this is a distinction without merit since this Court holds that the transacting business test of § 12 expanded the "presence" or "found" test. The *Flank* Court found it unnecessary to decide if the "found" test was so broadened since it determined that both tests were met. *Supra* at 359.

11. *Supra;* note 10. *See also Waldron v. British Petroleum Co., Ltd.*, 149 F.Supp. 830 (S.D.N.Y.1957) where the Court said:
A corporation may be a fiction of the law but there is no reason to carry the fiction to the extreme of saying that a corporation which has wholly owned subsidiaries performing services in the local jurisdiction which ordinarily would be performed

by service employees, or making sales which ordinarily would be made by a sales department, is in fact not transacting business in that jurisdiction, particularly when the entire corporate set-up of the defendant shows that it is designed to operate to a substantial degree through separate corporate entities responding to the wishes and directions of the parent and providing the revenues sought by the parent. We would be exalting fiction over fact if we were to conclude that under those circumstances the parent company was not in fact transacting business in this District through the instrumentality of its wholly owned subsidiaries. *Id.* at 835.

12. 224 F.2d 369 (5th Cir. 1955). *Green* involved antitrust claims against a chewing gum manufacturing corporation. *Green* held that the corporation "transacted business" within § 12 even though the corporation was

Consideration of the totality of factors and operations elucidated in the above cases leads this Court to the conclusion that Nissan-Japan was also "transacting business" within the judicial districts during the jurisdictional period. Unquestionably the value of Nissan-Japan's motor vehicles and other products shipped into the forum districts which are resold by Nissan-USA are of sufficient magnitude to come within the test " . . . the sales would appear to be substantial from the average businessman's point of view." *Sunbury Wire Rope Mfg. Co. v. U. S. Steel Corp.*, *supra* at 427. Establishing a wholly-owned subsidiary to distribute Nissan-Japan's vehicles within the forum districts is at least as much a contact with the forums as soliciting orders by mail from independent vendors within the forum, *Green v. U. S. Chewing Gum Mfg. Co.*, *supra* note 12 or choosing distributors for liquor after obtaining a state license to permit liquor sales to wholesalers located within the district and then planning and supplying advertising in a district pursuant to the license provisions, *Brandt, supra.*

That Nissan-Japan's products were all shipped "C.I.F."[13] by Marubeni-America to Nissan-USA does not render the above cited cases inapposite. There is evidence that Nissan-Japan delivered its products to Marubeni-America for shipment to Nissan-USA only after confirmation of orders from Nissan-USA. The "selling and shipping" language in the *Eastman Kodak* case, *supra*, the *Hartley & Parker* case, *supra*, and other

cases was certainly not intended to require limiting venue in antitrust actions to cases only where a manufacturer sold directly to a distributor and personally shipped directly to a distributor. Limiting "sales" and "delivery" or "shipping" in this context to their technical meanings again would be giving blind deference to technicalities when within the "practical, everyday business or commercial concept," Nissan-Japan caused its products to be delivered into the forum districts with the knowledge and intent that they would be distributed for resale by Nissan-Japan's wholly-owned subsidiary, Nissan-USA.[14]

Consequently, Nissan-Japan "transacts business" in the forum districts within the meaning of § 12 of the Clayton Act either by virtue of the control it potentially can exert over Nissan-USA's decisions which may involve violations of the anti-trust laws or the substantiality of revenue generated by sales of motor vehicles and parts to Nissan-USA located within the forums. Such potentiality must also be considered with the fact of establishment by Nissan-Japan of its wholly-owned subsidiary Nissan-USA solely for the purpose of exploiting the market for Nissan-Japan's products within the forum districts. This result comports with the Congressional intent to expand the venue requirements from a district in which a corporation resides or is "found" to one in which a corporation "transacts business," and it is practically mandated in this "era of multinational corporations and worldwide corporate empires."[15] Because this Court de-

located outside the judicial district, received orders sent by mail from within the district and did not solicit in the district except by mail. Paramount was that the sales receipts from deliveries to the district amounted to about twenty-five thousand dollars per annum and such deliveries were found to be substantial even though this business was a very small part of the total business of the company. *Id.* at 371. See the language from *Sunbury Wire Rope Co. v. U. S. Steel Corp.*, 129 F.Supp. 425, 427 (E.D.Pa.1955) as quoted in *Green, supra* at 374. *See also Pape Television Co. v. Associated Artists*

*Production Corp.*, 277 F.2d 750 (5th Cir. 1960) ; *Brandt v. Renfield Importers, Ltd.*, 278 F.2d 904 (8th Cir. 1960).

13. The risk of loss was on Marubeni-America and title passed to that company in Japan.

14. *See* Judge Grim's construction of "delivered" in the *Sunbury Wire Rope Mfg.* case, *supra* at 427 and 428.

15. *Audio Warehouse Sales, Inc. v. U. S. Pioneer Electronics Corp., et al.*, 1975 Trade Cases ¶ 60,213 (D.D.C. March 11, 1975).

termines that Section twelve's venue requirements have been met there is no need to consider whether the general venue statute, 28 U.S.C. § 1391(b), (c) or (d), is applicable. *See Albert Levine Assoc. v. Bertoni & Cotti, S.p.A.,* 314 F.Supp. 169 (1970), *Contra, Goldlawr, Inc. v. Shubert,* 169 F.Supp. 677 (E.D. Pa.1958).

## JURISDICTIONAL FACTS

At this juncture a listing of the applicable jurisdictional facts is appropriate:

1. Nissan-Japan owns 100% of the capital stock of Nissan-USA thereby making Nissan-USA Nissan-Japan's wholly owned subsidiary corporation. [Intg. 147 (Cal. 150)].

2. Nissan-USA is a California corporation, organized in 1960 with its principal operating office and place of business in Carson, California. It is authorized to transact business everywhere in the continental United States. [Intg. 179(f) (Cal. 182(f); Intg. 234 (Cal. 246)] Nissan-USA is the exclusive wholesale distributor in the continental United States for Nissan-Japan's motor vehicles, parts, and accessories. [Intg. 7(a); Yoneda Affidavit ¶ 8 (Cal. and Ill. ¶ 10)]

3. Nissan-Japan admits creating, organizing, forming and maintaining Nissan-USA to sell and distribute Datsun motor vehicles, parts and accessories in the United States. [Intg. 175 (Cal. 178)]

4. Nissan-USA engages in no motor vehicle manufacturing or assembling in the United States but only sells and distributes Datsun motor vehicles, parts and equipment in the continental United States [except that it sells and distributes items incident to this function, i. e. accessories, advertising aids, catalogues]. [Intg. 164 (Cal. 167); Intg. 67 (Cal. 69, 70)]

5. The principal officers of Nissan-USA are former officers or employees on "leave of absence" from Nissan-Japan. Since 1965, every director has been either an officer, director, or employee of Nissan-Japan or a former officer or employee on "leave of absence" from Nissan-Japan. Takashi Ishihara was a director of Nissan-USA from the beginning of 1965 to November 25, 1965 and a managing director of Nissan-Japan from November 29, 1965 to November 29, 1969. Keiichi Matsumara was a director of Nissan-USA from November 25, 1965 until August 3, 1966 while he was a managing director of Nissan-Japan from November 29, 1965 until August 3, 1966. Matsaka Okuma has been a director of Nissan-USA from November 25, 1966 to date, was Nissan-Japan's Managing Director in charge of exports to North America from November 29, 1966 until November 29, 1973, and is presently Nissan-Japan's Executive Managing Director responsible for all export operations. Yuji Shimamoto was a director of Nissan-USA from November 25, 1966 to November 26, 1973 and a director of Nissan-Japan from November 29, 1963 to November 28, 1973. [Missouri Exhibit A]

6. Nissan-Japan and Nissan-USA exchange a substantial amount of technical and business information including business assistance. [Intg. 1, 3, 15(b), 44, 55, 56, 58, 60, 64, 65, 70, 79, 98, 215; Cal. 61, 65(a), 66, 73, 82, 101, 218; Ill. 113] However, there is no programmed exchange of advertising material and none of the advertising material from Nissan-Japan reaches consumers. There is no evidence about communication on sales or pricing policies before their adoption by Nissan-USA.

7. Nissan-Japan requires Nissan-USA to keep and maintain records of the names and addresses of all purchasers of new Datsun motor vehicles in the United States. [Intg. 110 (Cal. 113)]

8. Nissan-Japan has paid the travel and relocation expenses of its officers and directors, as well as other employees, who, during the period 1965 to date, assumed positions with Nissan-USA and resided in the United States. [Intg. 205 (Cal. 208; Ill. and Tex. 204); Intg. 206 (Cal. 209; Ill. and Tex. 205)]

846

9. Nissan-Japan has no commercial officers, has no phone listing, places no advertising, solicits no business, initiates no dealer or consumer contact, has no showroom, makes no sales and performs no service for retail purchasers of Datsun motor vehicles. The books and records of Nissan-USA and Nissan-Japan are separately maintained and Nissan-USA's are kept in accordance with its own accounting procedures and not Nissan-Japan's. Nissan-USA is fully capitalized and financially independent of Nissan-Japan. [Yoneda affidavit]

10. Nissan-Japan as evidenced in annual business reports to stockholders and other publications appears to view its relationship with Nissan-USA and Nissan dealers as one part of an integral world-wide operation. [Missouri Exhibits C-2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, D, E]

11. Over the period 1967 to 1973, Nissan-Japan's new motor vehicle exports to the continental United States have accounted for between 29% and 41% of its total motor vehicle exports throughout the world. [Nissan Business Report 1973 at p. 5]

12. Before October, 1971, new Datsun motor vehicle warranties were issued by Nissan-Japan directly to the retail purchasers of new Datsuns. Subsequently, apparently without written authorization, Nissan-USA was authorized, directed, sanctioned and granted the right and authority to issue motor vehicle warranties directly to new Datsun retail purchasers. Nissan-USA is reimbursed a substantial percentage of its warranty expenditure by Nissan-Japan. [Intg. 26–28]

13. Without any document embodying standards relating to the type and quality of advertising with respect to Datsun vehicles, parts and accessories or other standards designed to maintain the goodwill of Nissan-Japan or the reputation of Datsun products, Nissan-Japan has granted to Nissan-USA the right and license to use, and the right to grant to Nissan dealers in the United States the right and license to use, Nissan-Japan's registered trademarks and the tradenames "Datsun" and "Nissan." [Intg. 8(a)–(d), 13]

14. Nissan-Japan transports new Datsun motor vehicles to the United States on automobile transport ships chartered by Nissan-Japan's subsidiary, Nissan Motor Car Carrier Co., Ltd. [N.M.Supp. 3; Ill. 247; Nissan Japan Business Report 1972 at 12] In 1972 there were approximately eleven main vessels under charter by Nissan Motor Car Carrier Co., Ltd. [Nissan Japan Business Report 1972 at 7].

15. Datsun vehicles, equipment, parts and accessories are sold by Nissan-Japan in Japan to Marubeni-American Corp., an export-import company which exports and imports unspecified other products as well as Nissan products to and from Japan. [Intg. 171 (Cal. 174)] The products are shipped "C.I.F. U.S.A. Ports." [Missouri Exhibit M] Thus, title and risk of loss pass to Marubeni-America in Japan. Marubeni-Japan, the 100% owner of Marubeni-America, owns 3.9% of the stock of Nissan-Japan [among ten largest shareholders of Nissan-Japan] while Nissan-Japan owns approximately 5% of the outstanding stock of Marubeni-Japan. [Ill. 137; Ill. Yoneda Affidavit ¶ 5] Nissan-Japan does not transfer Datsun vehicles to Marubeni-America prior to confirmation of orders with Nissan-USA. [Intg. 18] After going through Customs, the Nissan products are delivered by Marubeni-America to Nissan-USA which takes title in the United States.

IN PERSONAM JURISDICTION OVER NISSAN-JAPAN

■ As earlier stated, Nissan-Japan has challenged the in personam jurisdiction over it in all forums except New Jersey, New York and Minnesota. The contacts of Nissan-USA on behalf of Nissan-Japan in these states and the presence of the franchised dealers are sufficient for in personam jurisdiction if the state legislatures have enacted

long-arm statutes purporting to allow jurisdiction.

In personam jurisdiction was greatly expanded by the United States Supreme Court decision *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), in which a due process test of great flexibility was promulgated: a foreign defendant is amenable to suit if it has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend the 'traditional notions of fair play and substantial justice.'" *Id.* at 316, 66 S.Ct. at 158. In a later case, *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Supreme Court held an isolated contact with the forum sufficient to support jurisdiction because of the causal relation to the claim in question. The test was further refined in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), where the Court held · that " . . . it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws . . ." *Id.* at 253, 78 S.Ct. at 1240. The *Hanson* Court held that a state court could not, by constructive service, acquire personal jurisdiction over a foreign trust company since the cause of action was not one that arose out of an act done or transaction consummated in the forum state.

It thus appears that state long-arm statutes can reach only as far as Fourteenth Amendment due "process" allows and therefore the tests as outlined in the Supreme Court cases above must be met.

## "TORTIOUS ACT" PROVISIONS OF STATE LONG–ARM STATUTES

State long-arm statutes commonly provide that persons or corporations are subject to the jurisdiction of the Courts following the " . . . commission of a tortious act within [the] State, . . ."[16]

In construing the Illinois long-arm statute, *supra*, to reach a Pennsylvania corporation which manufactured a defective part which was incorporated into a product ultimately sold in Illinois, the Illinois Supreme Court held that in applying the "minimum contacts" in-personam test of jurisdiction the place of injury was the location of the "tortious act." *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961). *Gray* held that the *Hanson v. Denckla* test was met since the corporation benefited from the sale of a product which incorporated its part and it was immaterial that the product entered the forum through an independent middle-man or that someone other than the corporation shipped the product into the forum state.

It is evident that during the jurisdictional period Nissan-Japan invoked the benefits and protection of the forums' laws under the *Hanson v. Denckla* test as it was applied by the *Gray* court. However, the question arises of whether *Gray*, a products liability case, is distinguishable from the case *sub judice* in view of the strong policy considerations in products liability cases and the ultimate liability of the manufacturer for its defective products. Cutting against such a distinction is the fact that, like a defective product, the injury within the forums which could result from a price fixing conspiracy by a manufacturer, its distributor and franchised dealers, is certainly foreseeable even though such injury is only of a pecuniary nature. It is a distinction without merit that a products liability injury arises out of the use of the product because injury as a result of a price fixing conspiracy is incident to the transaction of sale itself. The buyer who pays higher prices due to such a conspiracy is injured at the time such sale is consummated. The analogy is obvious. From a policy point of view

16. See, e. g., *Ill.Rev.Stat.* Ch. 110 § 17.

an even greater reason can be envisioned for reaching a manufacturer in a case such as the present one—every buyer of such a "tainted" product is injured and thus the injury is widespread whereas injuries due to defective products are generally relatively rare in proportion to the total number of a given product sold.[17]

Further support for the utilization of "tortious act" provisions in cases such as the present is the reasoning of *Jack O'Donnell Chevrolet, Inc. v. Shankles,* 276 F.Supp. 998 (N.D.Ill.1967) in which a non-resident bank was charged with conspiracy to honor only those of plaintiff's drafts drawn upon the bank which the co-conspirator authorized. The checks in issue were presented for payment by an Illinois depository bank whose depositor was an Illinois corporation although all the defendant bank's overt acts or inactions occurred in Alabama. In finding jurisdiction present the Court reasoned that in dealing with an Illinois bank the Alabama bank had available to it the benefits and protection of Illinois law. The Court also concluded that defendants must have contemplated that their actions would cause injury to an Illinois party in Illinois. Citing *Gray,* the *O'Donnell* Court found jurisdiction present for the conspiracy count but not for the contract or tort counts since neither of them involved a scienter element: the defendant bank did not contemplate the transaction of business in Illinois or contemplate being placed in a position where its negligence would or could cause injury in Illinois. This test was referred to as the "contemplation test" by the *O'Donnell* Court. In the present case, Nissan-Japan must certainly have contemplated that any price-fixing activity on its part would have effects within the forum states due to the substantial sales of Nissan products within the forum states.[18]

Therefore, with the proviso that the forum states' law is the final determiner, under the "contemplation test" of *Jack O'Donnell, supra,* and the reasoning of *Maricopa County, supra,* Nissan-Japan should be subject to the jurisdiction of the forum courts under state "tortious act" long-arm statutes since Nissan-Japan surely must have contemplated that any price-fixing it might have engaged in would have consequences extending into the forums. Furthermore, if Nissan-Japan allegedly chose to embark upon a course of conduct with predictably injurious consequences to persons within the forum states it can have no legitimate objection to defending its conduct in the Courts of the States. This Court realizes that something more than the mere allegation that a foreign defendant is involved in a price-fixing conspiracy should be required to achieve jurisdiction in cases such as the present one to avoid harrassment, or similarly situated defendants.[19] The case *sub ju-*

17. Nissan-Japan cites cases to distinguish the present situation from the rationale applied in *Gray, supra. Magnaflux Corp. v. Foerster,* 223 F.Supp. 552 (N.D.Ill.1963) and *Gypsy Pipeline Co. v. Ivanhoe Petroleum Co.,* 256 F.Supp. 567 (D.Colo.1966). However, in both cases, jurisdiction was held lacking due to insufficiency of jurisdictional factual development. 223 F.Supp. at 565, 256 F.Supp. at 569.

18. See jurisdictional fact No. 11, *infra. See also, Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.,* 383 F.2d 97, 103 (5th Cir. 1967) ; *Maricopa County v. American Petrofina, Inc.,* 322 F.Supp. 467 (N.D.Colo. 1971) (Non-resident defendant subject to in personam jurisdiction of forum since alleged conspiracy in foreign state which affected

price structure in forum 'caused an event to occur' in violation of § 4 of the Clayton Act and defendant had no other contacts with the forum state.)

19. See Judge Christensen's comments in *Intermountain Ford Tractor Sales Co. v. Massey Ferguson, Ltd.,* 210 F.Supp. 930, 933 (D.Utah 1962), aff'd. 325 F.2d 713 (10th Cir. 1963), reh. denied (1964), to the effect that the problem with allowing venue upon merely alleging conspiracy is that the final decision on the merits also determines the outcome of the venue question. This explains to some extent the rejection of the *Giusti v. Pyrotechnic Industries,* 156 F.2d 351 (9th Cir. 1946), line of cases which generally hold that location of an alleged co-conspirator within a forum is sufficient to allow juris-

*dice* is distinguishable, however, since much more has been shown than the mere presence of an alleged co-conspirator within the forum. There was the presence of the potential for control by Nissan-Japan or Nissan-USA [and indirectly the franchised dealers] over the decisions and policies which might involve violations of the anti-trust laws.[20] Furthermore, like Titan Valve Co. in *Gray*, Nissan-Japan invoked the protections and benefits of the laws of the forum states by causing its products to be shipped to the country and sold in the forum states by its wholly owned subsidiary, Nissan-USA, which admittedly is doing substantial business in the forum states. Indeed, under the *Gray v. American Radiator & Standard Sanitary Corp.*, *supra*, rationale, it would be sufficient for jurisdictional purposes and not violate due process if the Nissan products merely found their way into the forum states through the stream of commerce. Whether a conspiracy is considered a continuous activity or a single act, the effects of the alleged conspiracy certainly would extend into the forums and furthermore, the cause of action in the case *sub judice* certainly arises out of the alleged conspiracy. Accordingly, it does not violate due process to find that the forum courts have jurisdiction under the minimum contacts—due process holdings of the United States Supreme Court in *International Shoe*, supra, and related cases cited above.

## TRANSACTING BUSINESS UNDER LONG–ARM STATUTE

State long-arm statutes generally contain provisions exerting jurisdiction of the courts over defendants "transacting business" or "transacting any business" within the states. Such statutes really treat the question of what constitutes "minimum contacts" with the states, *International Shoe, supra, et al.* In taking a substance over form approach, this Court will scrutinize the entire scope of Nissan-Japan's corporate activities to ascertain whether it is reasonable for the forum courts to assert in personam jurisdiction over that corporation. However, each state's application of its own long-arm statute must control in the final analysis.

*Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), is a watershed case widely cited for the proposition that mere ownership of a subsidiary without more will not subject the foreign parent to the jurisdiction of the state where the subsidiary is doing business. In *Cannon*, the parent corporation dominated its subsidiary through complete stock ownership but formal corporate separateness was carefully maintained in all respects. However, *Cannon* is distinguishable from the case *sub judice* in that Cannon involved no question of the constitutional powers of the state or of the federal government but it was merely the Supreme Court's interpretation of what activities constituted "doing business" within a forum and thus involved the concept of "presence" and not the less rigid "minimum contacts" test of *International Shoe*. The three cases cited by defendant, *Berkman v. Ann Lewis Shops*, 246 F.2d 44 (2nd Cir. 1957); *A. C. S. Industries v. Keller Industries, Inc.*, 296 F.Supp. 1160 (D.Conn.1969); *Scalisi v. Beech Aircraft Corp.*, 276 F. Supp. 58 (E.D.Pa.1967), do support the contention that *Cannon* is still good law but in *Berkman* and *A. C. S.* the long-arm statutes were held inapplicable while *Scalisi* like *Cannon* involved the stringent "doing business" test.[21]

---

diction or support venue over a foreign co-conspirator on agency theory.

20. See venue discussion above and the jurisdictional facts.

21. For contrary results involving long-arm statutes extending as far as due process allows see *Bland v. Kentucky Fried Chicken*, 338 F.Supp. 871 (S.D.Tex.1971) and *Taisho Fire & Marine v. Vessel Montana*, 335 F. Supp. 1238 (N.D.Cal.1971), *Duplan Corp. v. Deering Milliken, Inc.*, 334 F.Supp. 703 (D.S.C.1971).

Factors which have been considered significant in determining whether a foreign corporation is transacting business in a forum through its subsidiary for purposes of state long-arm statutes are: withdrawal of foreign company from jurisdiction where it had been transacting business while establishing local subsidiary to continue the business and dominating its board of directors;[22] local subsidiary performs all business which parent itself could perform by its own officials were it present, i. e. subsidiary a mere conduit for products of the parent;[23] overlap in boards of directors, officers and significant interchange of personnel between parent and subsidiary;[24] exchange between parent and subsidiary of records and documents;[25] listing of subsidiary as branch or agent of parent or that parent and subsidiary are part of one entity;[26] sending of technical personnel to subsidiary by parent at its expense to assist the latter with its operations;[27] advertising activities by subsidiary to benefit parent and vice versa;[28] and inconvenience to parent in defending in forum balanced with benefits and advantages from their activities within the forum.[29]

■ In light of the foregoing precedent it appears logical and this Court accepts that, standing alone, mere whole ownership of a subsidiary doing business within a forum is insufficient to justify jurisdiction over the foreign parent in that forum. Even some overlap or exchange of directors and officers between parent and subsidiary should not automatically justify jurisdiction over the parent since it is reasonable that the overlapping personnel could wear "two hats" as long as they wore one "hat" at a time. However, in view of (a) the totality of elements or incidents of control potentially exercisable over Nissan-USA by Nissan-Japan [see jurisdictional facts], (b) the substantiality of sales of Nissan products in the United States, (c) Nissan-Japan's obvious expectation that its exports would have a substantial impact on commerce in the forum states, (d) Nissan-Japan's setting up of Nissan-USA solely for the benefit of Nissan-Japan as a mere conduit for Nissan-Japan to exploit the American market, and (e) because Nissan-Japan viewed its relationship to Nissan-USA and the franchised dealers as part of an integral world-wide operation, Nissan-Japan was "transacting business" or "transacting any business" within the meaning of the long-arm statutes. Furthermore, subjecting Nissan-Japan to the jurisdiction of the forum courts does not offend the traditional motions of "fair play and substantial justice." In denying defendant's motion to dismiss due to lack of jurisdiction because Nissan-Japan was transacting business within the forums this Court is not "piercing the corporate veil" but merely analyzing the totality of Nissan-Japan's contacts with the forums and balancing the plaintiffs' rights to forums with the burdens connected with requiring Nissan-Japan to submit to the jurisdiction of the forum courts.

## SPECIFIC STATE LONG–ARM STATUTES

### Florida [72–1159–Civ–CA]

■ Plaintiff relies primarily on Florida Statutes § 48.181 and secondarily on § 42.182 for providing jurisdiction over Nissan-Japan to the Courts in Florida. Under Rule 4, F.R.C.P., service of process upon a non-resident is authorized where any statute of the state in which the district court is located so provides and this has been applied in

22. *Tokyo Boeki (U.S.A.), Inc. v. S. S. Navarrino,* 324 F.Supp. 361 (S.D.N.Y.1971).

23. *Id.; Martin Motor Sales v. Saab-Scandia of America, Inc., et al.,;* 1974–2 Trade Cases ¶ 75,196 at p. 97,390 (S.D.N.Y.1974).

24. *Tokyo Boeki, supra* note 22.

25. *Id.*

26. *Id.; S.C.M. v. Brother International Corp.,* 316 F.Supp. 1328 (S.D.N.Y.1970).

27. *Brother, Id.*

28. *Id.*

29. *Id.*

cases involving antitrust claims.[30] Thus, it is appropriate to look to these long-arm statutes in this inquiry.

Plaintiff urges that the contacts of Nissan-Japan treated elsewhere within this memorandum opinion constitute doing or transacting business under F. S.A. § 48.181.[31] Only alternatively and as a last resort does plaintiff seek to pierce the corporate veil and hold Nissan-Japan liable through the business activities of its subsidiary, Nissan-USA. Given the strictness in recognizing corporate separateness and identity by the Fifth Circuit and Florida, this Court finds that Nissan-USA is not the "alter ego" of Nissan-Japan.[32] However, this Court finds that Florida Statute § 48.181 provides for jurisdiction over Nissan in Florida courts since Nissan-Japan is carrying on a business or business venture within Florida as these terms are applied within Florida and by virtue of the control Nissan-Japan can potentially exercise over the affairs of Nissan-USA within Florida.

Transacting business through intermediaries under § 48.181(3) was at issue in *Talcott v. Midnight Publishing Corp.*[33] *Talcott* was a libel case in which the libelous publication was printed in Canada but distributed through independent wholesalers in Florida. The Fifth Circuit relied on *Fawcett Publications, Inc. v. Rand*,[34] for the proposition that foreign publishers should be amenable to the jurisdiction of Florida courts under § 48.181(3) only if they retain some degree of control over the distributors or over the property in their hands. However, *DeVaney v. Rumsch*,[35] broadened § 48.181. In *DeVaney*, the Florida Supreme Court held that the statute was satisfied where goods, property, or services are dealt with within the state for pecuniary benefit of the person providing or otherwise dealing in these goods, property or services.[36] The cause of action must, however, arise out of a transaction or operation connected with or incidental to the business or business venture.[37]

30. *See, e. g., Fashion Two Twenty, Inc. v. Steinberg*, 339 F.2d 836 (E.D.N.Y.1971) ; *E. C. C. Corp. v. Slater Electric, Inc.*, 336 F. Supp. 148 (E.D.N.Y.1971) ; *Albert Levine Assoc. v. Bertoni & Cotti*, 314 F.Supp. 169 (S.D.N.Y.1970) ; *Chemical Specialties Sales Corp. v. Basic, Inc.*, 296 F.Supp. 1106 (D. C.Conn.1968 ; *Hoffman Motors Corp. v. Alfa-Romeo S. p. A.*, 244 F.Supp. 70 (S.D. N.Y.1965).

31. § 48.181 Service on nonresident engaging in business in state.
(1) The acceptance by any . . . foreign corporations, . . . of the privilege extended by law to nonresidents and others to operate, conduct, engage in, or carry on a business or business venture in the state, . . . constitutes an appointment by the . . . foreign corporations of the secretary of state of the state as their agent on whom all process in any action or proceeding against them . . ., arising out of any transaction or operation connected with or incidental to the business or business venture may be served. The acceptance of the privilege is signification of the agreement of the persons and foreign corporations that the process against them which is so served is of the same validity as if served personally on the persons or foreign corporations.
         *         *         *         *         *

(3) Any person, firm or corporation which sells, consigns, or leases by any means whatsoever tangible or intangible personal property, through brokers, jobbers, wholesalers or distributors to any person, firm or corporation in this state shall be conclusively presumed to be operating, conducting, engaging in or carrying on a business venture in this state.

32. *See Bierman v. Tampa Electric Co.*, 505 F.2d 122 (5th Cir. 1974) ; *Turner v. Jack Tar Grand Bahama*, 353 F.2d 954 (5th Cir. 1964) ; *Hermetic Seal Corp. v. Savoy Electronics*, 290 F.Supp. 240 (S.D.Fla.1967).

33. 427 F.2d 1277 (5th Cir. 1970).

34. 144 So.2d 512 (3rd D.C.A.Fla.1962).

35. 228 So.2d 904 (Fla.1969).

36. *DeVaney* was a medical malpractice case in which the question to be answered was whether § 48.181 applied to persons practicing a profession in the State as well as to those engaging in business in the State.

37. Fla.Stat. § 48.131(1) ; *Donnelly v. Kellogg Company*, 293 F.Supp. 53 (S.D.Fla.1968) ; *see also Gordon v. John Deere Co.*, 320 F. Supp. 293 (N.D.Fla.1970) ; *Eder Instrument Co., Inc. v. Allen*, 253 So.2d 902 (3rd D.C.A. Fla.1971) ; *Sayet v. Interstate Blood Bank, Inc.*, 245 So.2d 142 (1st D.C.A.Fla.1971).

It cannot be questioned that Nissan-Japan has derived substantial pecuniary benefit from sales of its automobiles in Florida. Consequently, the *DeVaney* pecuniary benefit test has been met. Also, the cause of action arises out of or is incidental to the activities of Nissan-Japan in Florida since under F.S.A. § 48.-181(3) Nissan-Japan is conclusively presumed to be carrying on a business venture in Florida because Nissan-USA is a wholesaler or distributor through which Nissan-Japan is selling its product and any injury due to alleged price fixing would arise out of the sale of Datsuns in Florida. Another approach is determining whether the corporation is doing or transacting business in Florida because of the control it exercises over Nissan-USA. This control approach comes within the meaning of § 48.181.

*Deere & Co. v. Watts* [38] was a wrongful death action against a foreign manufacturer with a wholly owned subsidiary doing business in Florida. Despite the formal separateness of the companies the *Deere & Co.* Court held the manufacturer subject to jurisdiction under Fla. Stat. § 47.16 [the predecessor of § 48.-181] due to the degree of control the parent was capable of exerting over the operations and policies of the subsidiary since many of the same people held offices in both corporations. Also significant were that the financial statements of the appellant and its subsidiaries were consolidated in its annual reports and the subsidiaries were referred to therein as "Deere branches." Nissan-Japan, like Deere & Co. is capable of asserting substantial control over the affairs of its subsidiary.[39] For this rea-son and the profits Nissan-Japan derives from the sales of its products in Florida the substituted service on the Florida Secretary of State provided for by *Fla. Stat.* § 48.181 was proper. Accordingly, in action No. 74–1159–Civ–CA the motion of Nissan-Japan to dismiss the amended complaint of plaintiff due to lack of in personam jurisdiction is hereby ordered and adjudged denied and Nissan-Japan shall have fifteen days from the entry of this order to answer.

Missouri [74–1647–Civ–CA]

Under the Missouri "single act" long-arm statute [40], the "Commission of a tortious act within this state" includes extra-territorial acts producing consequences or injuries in Missouri.[41] *Metropolitan Sanitary District v. General Electric Co.*, 35 F.R.D. 131 (N.D.Ill. 1964) in which the alleged actions of defendants in conspiring to fix the prices of electrical equipment sold in Illinois in violation of the Sherman Act constituted "the commission of a tortious act within (the) state" of Illinois within the meaning of the Illinois Long-Arm Statute, is persuasive. *Adams Dairy Co. v. National Dairy Products Corp.*, 293 F.Supp. 1135, 1162 (W.D.Mo.1968) adopted the reasoning of *Metropolitan* by implication. Pursuant to this authority, Nissan-Japan is subject to the jurisdiction of the Courts of Missouri under that state's single act" long-arm statute.

Also, the "transaction of any business" clause of § 506.500 [42] has significantly broadened the former "doing business" concept of Missouri law to the extent permissible under the due process clause of the Fourteenth Amendment.[43]

38. 148 So.2d 529 (3rd D.C.A.Fla.1963).

39. See jurisdictional facts and discussion above.

40. § 506.500 R.S.Mo.1969.

41. *Fulton v. Chicago, Rock Island & Pacific Ry. Co.*, 481 F.2d 326 (8th Cir. 1973); *State ex rel. Deere & Co. v. Pinnell*, 454 S. W.2d 889 (Missouri, 1970); *Adams Dairy Co. v. National Dairy Products Corp.*, 293 F.Supp. 1135, 1162 (W.D.Mo.1968) (Adopted the reasoning of *Metropolitan Sanitary District v. General Electric Co.*, 35 F.R.D. 131 (N.D.Ill.1964) by implication).

42. R.S.Mo.1969, V.A.M.S.

43. *J. F. Pritchard & Co. v. Dow-Chemical of Canada, Ltd.*, 331 F.Supp. 1215, 1218 (W.D. Mo.1971), *aff'd* 462 F.2d 998 (8th Cir. 1972); *State ex rel. Deere & Co. v. Pinnell, supra.*

As determined above, it does not offend the minimum contacts—due process requirements to subject Nissan-Japan to the jurisdiction of state courts due to the contacts it has with the forums and; accordingly in case No. 74–1647–Civ–CA Nissan-Japan's motion to dismiss due to lack of in personam jurisdiction is hereby ordered and adjudged denied. Nissan-Japan shall have fifteen days from the date of entry of this order to file its answer in 74–1647–Civ–CA.

California, Colorado, Connecticut, Illinois, Louisiana, New Mexico and Texas [74–1698–Civ–CA; 75–8–Civ–CA; 75–13–Civ–CA; 75–15–Civ–CA; 75–3–Civ–CA; 74–1671–Civ–CA; and 74–1697–Civ–CA respectively]

Under the Illinois,[44] Colorado,[45] and New Mexico[46] long-arm statutes the "commission of a tortious act within this State" includes extraterritorial acts producing consequences, damages, or injuries in those states.[47] The same interpretation has been given to pertinent provisions of the statutes of Connecticut ("tortious conduct in the state")[48], Texas ("committing of any tort in whole or in part in this State")[49], Louisiana ("causing injury or damage in this state")[50], and California[51]. The claim or "tort" in a private antitrust action arises or occurs where the plaintiff suffers injury to his business or property, to wit, within the forum states.[52]

Accordingly, the forum states have jurisdiction over Nissan-Japan pursuant to

44. *Ill.Rev.Stat.* ch. 110, § 17(1)(b).

45. 1965 Perm.Supp., *C.R.S.* § 37–1–26(c).

46. N.M.S.A. § 21–3–16, subd. A(3).

47. *Consolidated Laboratories, Inc. v. Shandon Scientific Co.*, 384 F.2d 797 (7th Cir. 1967); *Hutter Northern Trust v. Door County Chamber of Commerce*, 403 F.2d 481 (7th Cir. 1968); *Metropolitan Sanitary District v. General Electric Co.*, 35 F.R.D. 131 (N.D.Ill.1964); *Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill.2d 432, 176 N.E.2d 761 (1961); *Anderson v. Penncraft Tool Co.*, 200 F.Supp. 145, 146 (N.D.Ill. 1961); *Vandermee v. District Court*, 164 Colo. 117, 433 P.2d 335 (1967); *Czarnick v. District Court*, 175 Colo. 482, 488 P.2d 562 (1971); *Texair Flyers, Inc. v. District Court*, 506 P.2d 367 (Colo.1973); *Blount v. T. D. Publishing Corp.*, 77 N.M. 384, 423 P.2d 421 (1967); *State v. MacPherson*, 63 N.M. 308, 309 P.2d 981, *cert. denied*, 355 U.S. 825, 78 S.Ct. 32, 2 L.Ed.2d 39 (1957).

48. Conn.Gen.Stat.Ann. § 33–411(c)(4).

49. Vernon's Tex.Rev.Civ.Stat.Ann. Art. 2031b.

50. L.R.S. 13 § 3201(d).

51. West's Ann.Code Civ.Proc. § 410.10 [1970].

52. *Buckley v. New York Post Corp.*, 373 F. 2d 175 (2d Cir. 1967); *Chemical Specialties Sales Corp.—Industrial Div. v. Basic, Inc.*, 296 F.Supp. 1106 (D.Conn.1968); *Sheridan v. Cadet Chemical Corp.*, 25 Conn.Sup. 17, 195 A.2d 766 (1963); *Southern New England Distributing Co. v. Berkeley Finance Corp.*, 30 F.R.D. 43 (D.Conn.1962); *Hey-*

*mand v. Kline*, 344 F.Supp. 1081 (D.Conn. 1970); *Eutectic Corp. v. Curtis Noll Corp.*, 342 F.Supp. 761 (D.Conn.1972); *Jetco Electronics Industries, Inc. v. Gardiner*, 473 F.2d 1228 (5th Cir. 1973); *Eyerly Aircraft Co. v. Killian*, 414 F.2d 591 (5th Cir. 1969); *Ruel v. Sahara Hotel*, 372 F.Supp. 995 (S.D.Tex. 1974); *Hearne v. Dow-Badische Chemical Co.*, 224 F.Supp. 90 (S.D.Tex.1963); *Time, Inc. v. Manning*, 366 F.2d 690 (5th Cir. 1966); *Buckley v. New York Times, Inc,.* 338 F.2d 470 (5th Cir. 1964); *North Central Utilities, Inc. v. Consolidated Pipe and Supply Co.*, 62 F.R.D. 676 (W.D.La.1974); *Wells v. English Electrical Ltd., Norman Engine Div.*, 60 F.R.D. 573 (W.D.La.1973); *Drilling Engineering, Inc. v. Independent Indonesian American Petroleum Co.*, 283 So.2d 687 (La.1973); *Moore v. Central Louisiana Electric Co., Inc.*, 273 So.2d 284 (La.1973); *Bible v. T. D. Publishing Corp.*, 252 F.Supp. 185 (N.D.Cal.1966); *Buckeye Boiler Co. v. Superior Court*, 71 Cal.2d 893, 80 Cal.Rptr. 113, 458 P.2d 57 (1969); *Shoei Kako Co., Ltd. v. Superior Court*, 33 Cal.App.3d 808, 109 Cal.Rptr. 402 (1973); *Jeter v. Austin Trailer Equipment Co.*, 122 Cal.App.2d 376, 265 P.2d 130 (1953); *Koninklijke L. M. v. Superior Court*, 107 Cal.App.2d 495, 237 P. 2d 297 (1951); *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.*, 383 F.2d 97 (5th Cir. 1967); *Simpson v. Union Oil Co. of Cal.*, 311 F.2d 764 (9th Cir. 1963); *Northwestern Oil Co. v. Socony-Vacuum Oil Co.*, 138 F.2d 967 (7th Cir. 1943); *Fashion Two Twenty, Inc. v. Steinberg*, 339 F.Supp. 836 (E.D.N.Y.1971); *Albert Levine Assoc. v. Bertoni & Cotti*, 314 F.Supp. 1969 (S.D.N.Y. 1970).

the "tortious act" provisions of the long-arm statutes of those states.

Also, it is clear that both state and federal courts have uniformly approved application of the minimum contracts test to interpretation of the "transaction of any business" clause of the long-arm statutes of Illinois,[53] Colorado,[54] and New Mexico.[55]

To the same effect has been the interpretation given to pertinent provisions of the statutes of Connecticut ("transacting business"; "production, manufacture or distribution of goods") [56], Texas ("engages in business") [57], Louisiana ("transacting any business"; "engaged in a business activity") [58] and California.[59]

Consequently, Nissan-Japan's motions to dismiss for lack of in personam jurisdiction are hereby

Ordered and adjudged denied in the California, Colorado Connecticut, Illinois, Louisiana, New Mexico, and Texas actions. Nissan-Japan shall have fifteen days from entry of this order to file its answers.

This memorandum order involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal from this order may materially advance the ultimate termination of this litigation. However, this should not be construed as a stay of the discovery presently ongoing in this litigation.

53. Ill.Rev.Stat. ch. 110 § 17(1)(a).

54. 1965 Perm.Supp., C.R.S. § 37–1–26(b).

55. N.M.S.A. § 21–3–16, subd. A(1); *O'Hare International Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971); *Fisons, Ltd. v. United States*, 458 F.2d 1241 (7th Cir. 1972); *Colorado-Florida Living, Inc. v. Deltona Corp.*, 338 F.Supp. 880 (D.Colo.1972); *Litvak Meat Co. v. Baker, supra; Focht v. Southwestern Skyways, Inc.*, 220 F.Supp. 441 (D. Colo.1963), *aff'd.* 336 F.2d 603 (10th Cir. 1964); *Winward v. Holly Creek Mills, Inc.*, 83 N.M. 469, 493 P.2d 954 (1972); *Melfi v. Goodman, supra; Clews v. Stiles*, 303 F.2d 290 (10th Cir. 1960); *Pope v. Lydick Roofing Co. of Albuquerque*, 81 N.M. 661, 472 P.2d 375 (N.M.1970).

56. Conn.Gen.Stat.Ann. § 33–411(b), (c).

57. Vernon's Tex.Rev.Civ.Stat.Ann. Art. 2031b §§ 2–4.

58. L.R.S. 13:3201.

59. West's Ann.Code Civ.Proc. § 410.10 [1970]. *Horn Construction, Inc. v. Stran-Steel Corp.*, 26 Conn.Sup. 201, 216 A.2d 833 (Conn.Comm.Pl.1965); *Connecticut Tool and Mfg. Co., Inc. v. Bow-Steel Distributors, Inc., supra; Sher v. HMH Publishing Co., Inc.*, 289 F.Supp. 917 (D.Conn.1968); *Michael Schiavone & Sons, Inc. v. Galland-Henning Mfg. Co.*, 263 F.Supp. 261 (D. Conn.1967); *Chemical Specialties Sales Corp.—Industrial Div. v. Basic, Inc., supra; Lone Star Motor Import, Inc. v. Citroen Cars Corp., supra; Atwood Hatcheries v. Heisdorf & Nelson Farms, supra; Product Promotions, Inc. v. Cousteau*, 495 F.2d 843 (5th Cir. 1974); *Modine Mfg. Co. v. North East Independent School Dist.*, 503 S.W.2d 833 (Tex.Civ.App.1973) (writ ref. n. r. e.); *Custom Textiles, Inc. v. Crown Sample Book Co.*, 472 S.W.2d 848 (Tex.Civ.App.1971) (writ ref. n. r. e.); *Uvedale Rock Asphalt Co. v. Consolidated Carpet Corp.*, 457 S.W. 2d 649 (Tex.Civ.App.1970) (writ ref. n. r. e.); *National Truckers Service, Inc. v. Aero Systems, Inc., supra; Crothers v. Midland Products Co.*, 410 S.W.2d 499 (Tex.Civ. App.1967); *Copeland v. Gordon Jewelry Corp.*, 288 So.2d 404 (La.App.1974); *Drilling Engineering, Inc. v. Independent Indonesian American Petroleum Co., supra; Fisher v. Albany Machine and Supply Co.*, 260 So.2d 691 (La.1972); *Aucoin v. Hanson*, 207 So.2d 834 (La.App.1968); *Curtis v. Golino, supra; North Central Utilities, Inc. v. Consolidated Pipe and Supply Co., supra; Overland Machined Products, Inc. v. Swingline, Inc.*, 224 Cal.App.2d 46, 36 Cal.Rptr. 330 (Cal.App.), *cert. denied*, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964); *Beirut Universal Bank v. Superior Court*, 268 Cal.App.2d 832, 74 Cal.Rptr. 333 (Cal.App.1969); *West Publishing Co. v. Superior Court*, 20 Cal.2d 720, 128 P.2d 777 (1942); *Henry R. Jahn & Son v. Superior Court*, 49 Cal.App.2d 855, 323 P.2d 437 (1958); *Waco-Porter Corp. v. Superior Court*, 211 Cal.App.2d 559, 27 Cal. Rptr. 371 (1963); *Bibie v. T. D. Publishing Corp., supra.*