[Civ. 44406. First Dist., Div. Three. May 28, 1980.]

NEOGARD CORPORATION, Plaintiff and Appellant, v.
MALOTT & PETERSON-GRUNDY, Defendant and Respondent.

214

COUNSEL

Halley, Cornell & Lynch, Roger C. Peter, Robert H. Cornell and Frederick A. Patterson for Plaintiff and Appellant.

Dooley, Anderson, Berg & Pardini, David M. Dooley and David B. Franklin for Defendant and Respondent.

OPINION

**RHODES, J.***—The parties have raised a single, narrow issue: whether the State of California can temporarily prevent appellant Neogard Corporation from maintaining this lawsuit against appellee Malott & Peterson-Grundy without running afoul of the commerce clause of the United States Constitution. Specifically the issue is whether Neogard's business efforts in California from 1965 to 1974 constituted sufficient local contact with this state to make it reasonable for the latter to enforce Corporations Code sections 2105 and 2203, subdivision (c), statutes designed to facilitate service of process on and to prevent tax

*Assigned by the Chairperson of the Judicial Council.

evasion by out-of-state corporations. We conclude that Neogard's local presence was extensive enough to make application of the statutes to it reasonable and we affirm the judgment entered below.

## I

Neogard is a Texas corporation that markets a waterproofing system for certain floor surfaces in all 50 states. It is a wholly owned subsidiary of Jones-Blair Paint Company, also a Texas corporation. Jones-Blair manufactures a waterproofing solvent and is the licensee of a patented process for bonding the solvent. From 1965 to 1974 Neogard's function in California was to develop a market for the waterproofing "system," that is the package consisting of the solvent and its application process. While the corporation did not maintain inventory, an office, a bank account, a telephone number, or payrolled employees in the state during the decade in question, it nonetheless played an active local role in all critical areas of the marketing process: selling the system to architects, controlling how and by whom the system was physically applied, guaranteeing its quality, and supervising the repair of subsequent defects.

Promotion of the system was conducted in the following manner. Neogard hired a local firm to ferret out construction projects whose design indicated that a waterproofing system would be needed. The local firm (manufacturer's representative) would then undertake to persuade the architects or engineers of such projects to designate Neogard's system as one of the waterproofing systems upon which bids by contractors would be accepted.[1] The manufacturer's representatives were paid on a commission basis for any project that ultimately used the Neogard system.

The local firm was not on its own. Neogard personally trained its manufacturer's representatives how best to sell the system and supplied them with brochures and specification data sheets for use by the architects they contacted. Moreover, Neogard's sales representative for the west coast made quarterly visits, during which he would accompany the manufacturer's representatives to project designers' offices and would make the sales pitches himself. According to the northern California manufacturer's representative for 1967-1969, Neogard's west coast sales representative accompanied him during those two years to the offices of 96 of the 126 promising projects he had discovered. It is conceded that the sales representative was on the payroll and an employee of Neogard.

---

[1]An architect will almost never specify only one system by name but he or she will often specify only two.

When a sales effort was successful and the Neogard system was specified as one of those upon which bids would be taken, the process by which the contract to do the waterproofing was awarded was largely a formality controlled by Neogard. Neogard did not bid to install its own systems on California projects.[2] Rather, it certified one to three waterproofing contractors in a particular area as qualified to apply its product and informed project designers that only these designated contractors would bid to apply the Neogard product. With these companies it signed an "Applicator Agreement" that demanded that a contractor winning a Neogard bid had to purchase the solvent from Neogard and apply it according to Neogard's specifications.

Malott & Peterson-Grundy (hereafter MPG) became a Neogard applicator in 1965 and was apparently the only one in northern California. Established in 1911, its reputation with architects redounded to Neogard's benefit. According to MPG's president, Neogard would insist on knowing the precise specifications of every job bid upon. It would then advise MPG exactly what it would cost the latter to obtain the necessary materials from Neogard, MPG would tailor its bid accordingly, and the latter would succeed in obtaining the contract in 90 to 95 percent of the cases in which the Neogard system had been specified by name.

With respect to the actual performance of the construction contract the trial court found that Neogard exercised local supervision and control over MPG. The testimony established that it was of critical importance to Neogard that its system be applied correctly. It therefore trained its certified applicators locally and carefully, taking them step by step through their first few jobs and, until MPG proved itself competent, observed the latter's work closely in its first year with Neogard. Neogard also published an application manual to promote consistently high quality. MPG's president testified that Neogard people flew out from Texas to inspect every project MPG ever worked on, and that such inspections took place before, during, and after the application. On these visits the Neogard employee would invariably contact the architect's or the owner's representative as liaison between the latter and the contractor.[3]

---

[2]Neogard has a construction division that qualified to do business in this state in 1974.

[3]Neogard's vice president disputed this, contending that it would have been a physical impossibility for Neogard's 22 employees to visit every project even once. The trial court, as it was entitled to do, gave greater credence to the contrary testimony.

Finally, the evidence showed that a major selling point of the Neogard system was that Neogard and the contractor would jointly guarantee their work and product for three to ten years. Normally only the contractor guarantees such work and only for one year. Thus Neogard committed itself to an ongoing involvement with the local project as well as with the local contractor. The trial court found that a Neogard representative was sometimes present in California at completion of the project in order to sign the guarantee.[4] It appears too that when defects manifested themselves after the completion of a project and the guarantee had to be made good, Neogard people would appear at the site to assist MPG in remedying the problem.

In 1974 Neogard brought this lawsuit following a dispute between the parties as to which should bear the cost and responsibility for repairs necessary on four projects. MPG counterclaimed and in addition raised the affirmative defense that Neogard lacked the capacity to maintain a lawsuit based on intrastate business because it had not obtained a certificate to conduct such business prior to filing suit. (Corp. Code, §§ 2105, 2203, subd. (c).) A trial on the special defense was conducted first (Code Civ. Proc., § 597) whereupon the trial court found that the "business relationship between plaintiff and defendant between 1965 and 1974 constituted an interconnected pattern of inseparable business transactions," and that Neogard had "transacted intrastate business within the State of California in the course of that relationship." Since Neogard conceded that it had not obtained a certificate to conduct intrastate business the court entered judgment for MPG, holding that Neogard could not maintain the action until it complied with the penalty provisions of Corporations Code section 2203, subdivision (c).[5]

Neogard appeals,[6] contending that, as defined by decisions construing the commerce clause of the United States Constitution, prior to 1974 it

---

[4]Neogard denied this but here too the trial court was entitled to rely on the contrary testimony.

[5]While this appeal was pending Neogard apparently complied with all penalty provisions. The appeal was not rendered moot, however, because a decision in Neogard's favor would have permitted it to resume proceedings in the trial court without first having to answer MPG's affirmative defense that Neogard is now barred by the statute of limitations from resuming trial proceedings. At oral argument the parties requested that, if our decision were unfavorable to Neogard, we refrain from deciding the statute of limitations issue which had been tentatively raised by the parties but not briefed. We abide by that request.

[6]MPG has moved to dismiss the appeal on the ground that the same incapacity that barred Neogard from maintaining the lawsuit in the trial court bars it from appealing the determination of incapacity. It is a sufficient answer to point out that Code of Civil

had engaged only in interstate, not intrastate, business in California, and that preventing it from proceeding with this lawsuit forthwith is repugnant to the commerce clause.

## II

■ The statutory scheme at issue works as follows. By virtue of its doing business in California, even though that business is interstate, an out-of-state corporation may lawfully be made, and is made, amenable to service of process in California. (Corp. Code, § 2111; *Shaffer v. Heitner* (1977) 433 U.S. 186 [53 L.Ed.2d 683, 97 S.Ct. 2569]; *Cornelison v. Chaney* (1976) 16 Cal.3d 143 [127 Cal.Rptr. 352, 545 P.2d 264]; *Buckeye Boiler Co.* v. *Superior Court* (1969) 71 Cal.2d 893 [80 Cal.Rptr. 113, 458 P.2d 57].) ■ In addition, the out-of-state corporation may incur a tax obligation to the State of California by virtue of doing business, even interstate business, in and with residents of this state. (Rev. & Tax Code, §§ 23151.1, 23501, 6203; cf. *National Geographic v. Cal. Equalization Bd.* (1977) 430 U.S. 551 [51 L.Ed.2d 631, 97 S.Ct. 1386] (use tax); *Complete Auto Transit Inc. v. Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076] (francise tax); *Northwestern Cement Co. v. Minn.* (1959) 358 U.S. 450 [3 L.Ed.2d 421, 79 S.Ct. 357, 67 A.L.R.2d 1292] (net income tax).)

To facilitate service of process and to protect against tax evasion Corporations Code section 2105 requires that any foreign corporation wishing to transact intrastate business in California obtain a certificate from the Secretary of State. To obtain the qualifying certificate the corporation must consent to service of process, provide essential bits of information, and pay a licensing fee.[7] A corporation transacting intra-

---

Procedure section 597 states in pertinent part that when a trial court finds a special defense such as the instant one meritorious, "judgment...shall thereupon be entered and no trial of other issues in the action shall be had unless such judgment shall be reversed on appeal...." Code of Civil Procedure section 904.1, subdivision (a), provides in part that: "An appeal may be taken from a superior court in the following cases: a) From a judgment...."

[7]Corporations Code section 2105 provides: "(a) A foreign corporation shall not transact intrastate business without having first obtained from the Secretary of State a certificate of qualification. To obtain such certificate it shall file, on a form prescribed by the Secretary of State, a statement and designation signed by a corporate officer stating:

"(1) Its name and the state or place of its incorporation or organization.

"(2) The address of its principal executive office.

"(3) The address of its principal office within this state.

"(4) The name of an agent upon whom process directed to the corporation may be served within this state. Such designation shall comply with the provisions of subdivision (b) of Section 1502.

state business without a certificate risks a number of sanctions, both civil and criminal. Among them is the sanction provided for by Corporations Code section 2203, subdivision (c), the only one that has been applied to Neogard and the only one in issue. Corporations Code section 2203, subdivision (c) provides: "(c) A foreign corporation subject to the provisions of Chapter 21 (commencing with Section 2100) which transacts intrastate business without complying with Section 2105 shall not maintain any action or proceeding upon any intrastate business so transacted in any court of this state, commenced prior to compliance with Section 2105, until it has complied with the provisions thereof and has paid to the Secretary of State a penalty of two hundred fifty dollars ($250) in addition to the fees due for filing the statement and designation required by Section 2105 and has filed with the clerk of the court in which the action is pending receipts showing the payment of said fees and penalty and all franchise taxes and any other taxes on business or property in this state that should have been paid for the period during which it transacted intrastate business."

Neogard does not contend that its business activity in California from 1965 to 1974 was insufficient to render it amenable to service of process during those years. It does not contend that its business in and with this state during that decade gave rise to no tax liability.[8] Nor does it contend that it would have been burdensome for it to obtain a certificate of qualification during that period. Indeed it does not even contend that being penalized for noncompliance by a temporary halt to its lawsuit is particularly burdensome or unfair. ██ Nonetheless, Neogard argues that, as a matter of federal constitutional law, restraining it from proceeding forthwith with trial was unduly burdensome on its ability to engage in interstate commerce.

"(5) Its irrevocable consent to service of process directed to it upon the agent designated and to service of process on the Secretary of State if the agent so designated or the agent's successor is no longer authorized to act or cannot be found at the address given.

"(6) If it is a corporation which will be subject to the Insurance Code as an insurer, it shall so state such fact.

"(b) Annexed to such statement and designation shall be a certificate by an authorized public official of the state or place of incorporation of the corporation to the effect that such corporation is an existing corporation in good standing in that state or place or, in the case of an association, an officers' certificate stating that it is a validly organized and existing business association under the laws of a specified foreign jurisdiction.

"(c) Before it may be designated by any foreign corporation as its agent for service of process, any corporate agent must comply with Section 1505."

[8]According to documents that Neogard has filed in this court the Franchise Tax Board found the corporation liable for taxes for the years 1968 and 1970-1974.

Logically, if it comports with due process and the commerce clause to make Neogard amenable to local service of process, and if it comports with the same to hold Neogard taxable for its in-state business activities, it is difficult to see how enforcing a qualification statute, which Justice Frankfurter deemed "a conventional means of assuring responsibility and fair dealing on the part of foreign corporations coming into a state" (*Union Brokerage Co. v. Jensen* (1944) 322 U.S. 202, 210 [88 L.Ed. 1227, 1232-1233, 64 S.Ct. 967, 152 A.L.R. 1072]), which one constitutional scholar deems a "plainly not-very-burdensome state regulation" (Tribe, American Constitutional Law (1978) p. 341), and which an earlier writer viewed as designed merely to "equalize, in terms of regulation, the position of foreign and domestic corporations" (Note, *Sanctions for Failure to Comply With Corporate Qualification Statutes: An Evaluation* (1963) 63 Colum.L.Rev. 117, 117), could contravene the commerce clause.

Yet Neogard's argument is not woven entirely from whole cloth. There is a line of cases holding that a state may not penalize certain interstate commercial actors for failing to obtain a certificate qualifying them to do business in the state. And following these cases the Legislature itself has declared that if a corporation is engaged only in certain activities it will not be compelled to qualify pursuant to section 2105. However, Neogard's reliance on the foregoing authorities has two weaknesses: first, the facts of the instant case place Neogard within that category of interstate actors whom the Supreme Court has held may be regulated in the manner of section 2203, subdivision (c); second, the modern view of the commerce clause favors the constitutionality of applying section 2203 to Neogard.

In affirmatively granting to Congress the "Power...to regulate commerce...among the several states" (U.S. Const., art. I, § 8, cl. 3), the commerce clause from its inception has been viewed as a means of prohibiting the economic warfare between states that prevailed prior to adoption of the Constitution. (Tribe, *supra* at p. 321.) Suspicion of state regulations that discriminated against interstate interests in favor of local ones led to the adoption of certain apparently *per se* rules. Among them was the holding that a state had no power to compel a purely interstate seller to qualify to do business in the state. (*Crutcher v. Kentucky* (1891) 141 U.S. 47, 58 [35 L.Ed. 649, 652, 11 S.Ct. 851].)

The rule still has some life. In *Allenberg Cotton Co. v. Pittman* (1974) 419 U.S. 20 [42 L.Ed.2d 195, 95 S.Ct. 260], a Tennessee mer-

chant purchased cotton from a Mississippi farmer through the efforts of a Mississippi broker and temporarily stored the cotton in a Mississippi warehouse before distributing the cotton nationally. A Mississippi court dismissed the merchant's suit for breach of contract on the ground that the merchant had not complied with the state's qualification statute. After an extended discussion of the complexities of the cotton market the Supreme Court described dismissal of the suit as "a species of control over an intricate interstate marketing mechanism" (*id.* at p. 29 [42 L.Ed.2d at pp. 203-204]) and held it to be repugnant to the commerce clause. (*Id.* at p. 34 [42 L.Ed.2d at pp. 206-207].) The court viewed itself as reaffirming the rule that one who merely traffics in goods of a peculiarly interstate nature, e.g., wheat, livestock, and milk (*id.* at pp. 29-31 [42 L.Ed.2d at pp. 203-205]), without establishing local contacts in an individual state (*id.* at p. 33 [42 L.Ed.2d at pp. 205-206]), cannot be regulated by the latter. (See, e.g., *Dahnke-Walker Milling Co.* v. *Bondurant* (1921) 257 U.S. 282 [66 L.Ed. 239, 42 S.Ct. 106].)

Presumably so as not to conflict with *Allenberg Cotton*, in 1975 the Legislature provided that an out-of-state corporation would not be considered to be transacting intrastate business for purposes of section 2105 if the corporation's in-state activity consisted "solely" of "effecting sales through independent contractors" or "soliciting...orders, whether...through employees or agents or otherwise, where such orders require acceptance without this state before becoming binding contracts." (Corp. Code, § 191, subd. (c)(5) and (6); Stats. 1975, ch. 682, § 7, p. 1524.)

Neogard seeks to have the rule embodied in *Allenberg Cotton* and section 191 extended to the facts of this case, arguing that the former indicates a commerce clause construction heavily disfavoring any state action that has an impact on interstate actors. There is another view of the commerce clause, however, which has existed since its inception, and which has spawned cases closer to the present case in fact and spirit than *Allenberg Cotton*. We find these cases controlling.

The corollary to the view that state interference with interstate commerce is suspect is the perception that state regulation in appropriate cases is desirable even though some impact on interstate commerce can be discerned. The Supreme Court has utilized a number of different labels in finding particular state actions in harmony with the commerce clause even though they affect interstate actors. It has distinguished, for

example, statutes that are a legitimate exercise of the police power from those that regulate commerce, statutes focusing on subject matters of local concern from those involving subjects of national concern, and statutes affecting interstate commerce indirectly from those affecting it directly.[9] Finding these labels unsatisfactory, since the mid-1930's the court has, in Professor Tribe's view, "substituted the following, more openly indeterminate, principle: State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation." (Tribe, *supra* at 326.)[10]

There is little doubt (certainly Neogard raises none) that enforcement of California's qualification statute easily passes muster under such a balancing test and, for that matter, under the older labels. The enforcement scheme is designed to protect against unscrupulous corporate practices, equalizes the position of in-state and out-of-state corporations, and imposes no great burdens. It is thus not surprising that in a number of decisions the Supreme Court has found the enforcement of a qualification statute perfectly compatible with the theory and thrust of the commerce clause.

Thus in *Eli Lilly & Co.* v. *Sav-On-Drugs* (1961) 366 U.S. 276 [6 L.Ed.2d 288, 81 S.Ct. 1316] (the last relevant Supreme Court opinion in this area prior to *Allenberg Cotton*) an Indiana company sold drugs to wholesalers in New Jersey, a purely interstate sale that New Jersey could not regulate. (366 U.S. at pp. 278-279 [6 L.Ed.2d at pp. 291-292].) Eli Lilly went further, however. It employed salespeople whose job it was to persuade New Jersey pharmacists, physicians and hospitals to purchase Eli Lilly products from New Jersey wholesalers. This the court said was a "'domestic business,—inducing one local mer-

---

[9] See the discussion and the cases cited in Tribe, *supra* at pages 321-326.

[10] Thus in *Pike* v. *Bruce Church, Inc.* (1970) 397 U.S. 137, 142 [25 L.Ed.2d 174, 178, 90 S.Ct. 844] the court stated: "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co.* v. *Detroit*, 362 U.S. 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

chant to buy a particular class of goods from another' [footnote]" (*id.* at p. 282 [6 L.Ed.2d at p. 293], quoting *Cheney Bros. Co.* v. *Massachusetts* (1918) 246 U.S. 147, 155 [62 L.Ed. 632, 637, 38 S.Ct. 295]), and it held that New Jersey could temporarily bar access to its courts to the drug company. In doing so the court was clearly rejecting the contention made here by Neogard that any in-state act whose ultimate objective is an increase in interstate commerce must be classified as an interstate act for purposes of a qualification statute. Surely all of Eli Lilly's in-state promotional efforts were intended solely to increase its own interstate sales to New Jersey wholesalers. (See *Eli Lilly, supra,* 366 U.S. at pp. 290-291 [6 L.Ed.2d at p. 298] (Douglas, J. dis.).)[11]

A more direct balancing analysis was engaged in by the court in *Union Brokerage Co.* v. *Jensen* (1944) 322 U.S. 202 [88 L.Ed. 1227, 64 S.Ct. 967, 152 A.L.R. 1072]. In that case a customhouse broker, incorporated in North Dakota but licensed by Congress to engage in its business at the Minnesota-Canadian border, brought suit in Minnesota against one of its former officers. The suit was dismissed on the ground that the brokerage had not obtained a certificate of qualification to do business in Minnesota.

The Supreme Court, per Justice Frankfurter, affirmed the dismissal. The court fully acknowledged that the plaintiff's actual business transactions involved solely interstate commerce (imports and exports) and that its business was heavily regulated by Congress. (*Id.* at pp. 203-205, 209 [88 L.Ed.at pp. 1229-1230, 1232].) Nonetheless it did not find these facts dispositive.

"[T]he Commerce Clause does not cut the States off from all legislative relation to foreign and interstate commerce.... [¶] Union's business is localized in Minnesota, it buys materials and services from people in that State, it enters into business relationships, as this case, a suit against its former president, illustrates, wholly outside of the arrangements it makes with importers or exporters. To safeguard responsibility in all such dealings, dealings quite outside transactions immediately connected with import and export, Minnesota has made the same exactions of Union as of every other foreign corporation engaged in similar transactions. [¶] In a situation like the present, where

---

[11]Cases relying on *Eli Lilly* include *SAR Mfg. Co., Inc.* v. *Dumas Bros. Mfg. Co.* (5th Cir. 1976) 526 F.2d 1283, 1285; *Barbee* v. *United Dollar Stores, Inc.* (Miss. 1976) 337 So.2d 1277, 1279; *Paper Mfrs. Co.* v. *Ris Paper Co., Inc.* (1976) 86 Misc.2d 95 [381 N.Y.S.2d 959, 963].

an enterprise touches different and not common interests between Nation and State, our task is that of harmonizing these interests without sacrificing either. . . . [¶] In the absence of applicable federal regulation, a State may impose non-discriminatory regulations on those engaged in foreign commerce 'for the purpose of insuring the public safety and convenience; . . . a license fee no larger in amount than is reasonably required to defray the expense of administering the regulations may be demanded.' *Sprout v. South Bend*, 277 U.S. 163, 169. [¶] The Commerce Clause does not deprive Minnesota of the power to protect the special interest that has been brought into play by Union's localized pursuit of its share in the comprehensive process of foreign commerce. To deny the States the power to protect such special interests when Congress has not seen fit to exert its own legislative power would be to give an immunity to detached aspects of commerce unrelated to the objectives of the Commerce Clause. By its own force that Clause does not imply relief to those engaged in interstate or foreign commerce from the duty of paying an appropriate share for the maintenance of the various state governments. Nor does it preclude a State from giving needful protection to its citizens in the course of their contacts with businesses conducted by outsiders when the legislation by which this is accomplished is general in its scope, is not aimed at interstate or foreign commerce, and involves merely burdens incident to effective administration. And so we conclude that in denying Union the right to go to her courts because Union did not obtain a certificate to carry on its business as required by the Foreign Corporation Act, Minnesota offended neither federal legislation nor the Commerce Clause." (322 U.S. at pp. 207-212 [88 L.Ed. at pp. 1231-1234].) The court has never indicated any dissatisfaction with the reasoning or holding of *Union Brokerage*. (See *Allenberg Cotton, supra,* 419 U.S. at pp. 32-33 [42 L.Ed.2d at p. 205].)

As Justice Frankfurter candidly acknowledged in the course of articulating the principles quoted above, "the fate of state legislation" in the "literally scores of cases" bringing commerce clause questions before the court "has not been determined by these generalities but by the weight of the circumstances and the practical and experienced judgment in applying these generalities to the particular instances." (*Union Brokerage, supra,* 322 U.S. at p. 211 [88 L.Ed. at p. 1233].) Or as Professor Tribe has observed: "The Supreme Court's approach to commerce clause issues . . . often appears to turn more on *ad hoc* reactions to particular cases than on any consistent application of coherent princi-

ples."[12] This explains the uneven results reached by various federal courts in determining the constitutionality of applying qualification statute sanctions to different corporations.[13]

We do not pretend, therefore, that the result we reach today is free from doubt. Nonetheless it seems a fair result and one in accord with the Supreme Court's recent decisions setting aside its age-old commerce clause objections to state taxation on the "privilege" accorded out-of-state corporations to carry on the local aspects of their interstate business in corporate form. (See, e.g., *Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 289 [51 L.Ed.2d 326, 337, 97 S.Ct. 1076]; *Colonial Pipeline Co.* v. *Traigle* (1975) 421 U.S. 100, 110-112 [44 L.Ed.2d 1, 9-11, 95 S.Ct. 1538].)

■ Neogard did not enter California from 1965 to 1974 "merely . . . to contribute to or to conclude a unitary interstate transaction [citation]. . . ." (*Union Brokerage, supra,* 322 U.S. at p. 211 [88 L.Ed. at p. 1233].) It established relations with and paid commissions to manufacturer's representatives residing in this state. It sent sales representatives intrastate to induce construction contracts between California project designers and California waterproofing subcontractors. It assisted the latter in obtaining such contracts. It entered into contracts with such subcontractors and utilized this fact to induce contracts between the in-state parties. It supervised the physical in-state application of its waterproofing system. It signed contracts in-state to guarantee these projects and provided in-state supervision when defects appeared. No one of the foregoing activities would necessarily have constituted intrastate business. Together, despite the fact that Neogard strategically maintained no payrolled office here, they did. We find that Neogard was compelled to qualify to conduct such business by Corporations Code section 2105. ■ Because the qualification statute protects

---

[12]Tribe, *supra,* at page 342. See also Tushnet, *Rethinking the Dormant Commerce Clause,* 1979 Wis.L.Rev. 125, 129.

[13]*Compare SAR Mfg. Co., Inc.* v. *Dumas Bros. Mfg. Co.* (5th Cir. 1976) 526 F.2d 1283 (dismissal of suit for noncompliance upheld where Texas manufacturer of polyurethane operated a warehouse in Alabama and maintained two vehicles there) *with Cement Asbestos Products* v. *Hartford Acc. & Indem.* (10th Cir. 1979) 592 F.2d 1144 (dismissal of suit for noncompliance held unconstitutional where an Alabama corporation sold pipe in Colorado through independent authorized dealers and a resident sales representative, and employed two out-of-state troubleshooters to provide on-site installation assistance on an infrequent basis).

important state interests, does not discriminate against out-of-state corporations, imposes on such corporations a minimal burden relative to the interests served, and has been enforced in a manner ordinarily involving no onerous consequences, we affirm the dismissal of this lawsuit according to the terms of Corporations Code section 2203, subdivision (c).

▪ Neogard raises a final contention: that the cause of action in this lawsuit pertains to purely interstate contracts involving MPG's obligation to pay for solvent received, and thus could not be dismissed either under section 2203, subdivision (c) or the commerce clause. Section 2203, subdivision (c) provides in pertinent part: "A foreign corporation ...which transacts intrastate business without complying with Section 2105 shall not maintain any action or proceeding upon any intrastate business so transacted in any court of this state. . . ." Clearly, the fact that the contract sued upon is part and parcel of a course of business we have deemed "intrastate" for purposes of section 2105 renders the contract sued upon an "action...upon...intrastate business..." for purposes of section 2203, subdivision (c).

With respect to the claim under the commerce clause it is true that in *Eli Lilly* the court seemed to affirm the rule that "a State cannot condition the right of a foreign corporation to sue upon a contract for the interstate sale of goods." (366 U.S. at p. 282 [6 L.Ed.2d at p. 294].) However, here, as in *Eli Lilly*, more is involved than a contract for the sale of goods. The controversy actually at the heart of the lawsuit has to do with who is to pay for intrastate repairs on projects already completed. This would seem to involve questions going to the joint guarantee signed in-state by Neogard, its supervision of the actual construction, etc. These critical questions are "entirely separable from any particular interstate sale and the power of the State is consequently not limited" here by the rule relied on. (*Id.* at pp. 282-283 [6 L.Ed.2d at p. 294].)

The judgment is affirmed.

White, P. J., and Scott, J., concurred.

A petition for a rehearing was denied June 27, 1980, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1980.