Filed 11/3/22  Atiz Innovation Co. v. Warnock CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| ATIZ INNOVATION COMPANY LIMITED, | B314203 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19LBCV00104) |
| v. | |
| NICHOLAS WARNOCK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Law Office of Jeff A. Mann and Jeff A. Mann; Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Defendant and Appellant.

Niddrie|Addams|Fuller|Singh and Rupa G. Singh for Plaintiff and Respondent.

_____

This appeal arises from an international dispute over several unpaid debts. Plaintiff Atiz Innovation Company Limited, a book scanner manufacturer based in Thailand, brought this action against its then-North American distributors, Nicholas Warnock and Atiz Innovation, Inc., alleging failure to render payment for several scanning units. After a bench trial, the trial court concluded that Atiz Innovation, Inc. breached its contracts with plaintiff, imposed alter ego liability upon Warnock, and awarded damages. Warnock appeals, arguing that plaintiff's failure to meet Corporations Code section 2203, subdivision (c)'s[1] prerequisites for a foreign corporation to maintain an action in California state courts deprived plaintiff of standing, and that plaintiff inadequately pleaded alter ego liability, thereby impairing Warnock's ability to prepare a defense. We are unpersuaded, and therefore affirm.

## BACKGROUND

### I. Underlying facts

The following facts have been gleaned from evidence presented at the May 2021 bench trial unless otherwise indicated.

When he was a Ph.D. student, Sarasin Booppanon devised a device to automate the scanning of books. His book scanner has since become the standard method for digitizing books, utilized by universities, government, organizations, and museums, including the U.S. Supreme Court, U.C. Berkeley, Harvard, Stanford, Yale, and the Library of Congress.

---

[1] All undesignated statutory references that follow are to the Corporations Code.

2

Booppanon saw defendant Warnock, a photocopier salesman, on a reality TV show called "The Apprentice" in 2004. He contacted Warnock to ask whether he would be interested in a business partnership. In or around 2006, Booppanon and Warnock agreed that Booppanon would set up a company in Thailand, Plaintiff Atiz Innovation Company Limited (hereinafter Atiz Thailand), to manufacture the scanners, and Warnock would set up a company in California, Defendant Atiz Innovation, Inc. (hereinafter Atiz California), to sell the book scanners exclusively in North America, including the United States, Canada, and Mexico. Booppanon would serve as Atiz Thailand's CEO. Atiz Thailand was not itself certified to do business in California.

Atiz Thailand held 66.7% of shares in Atiz California, while Warnock was a 33.3% shareholder. The shareholder agreement provided that two of Atiz California's three directors could be designated by Atiz Thailand, while Warnock designated the third.

However, no directors or officers were appointed for Atiz California, and Warnock alone served as its president, CEO, CFO, secretary, director, and employee, while running the company from his home. Atiz Thailand never received any statements regarding Atiz Thailand's capital contributions, Atiz California's annual tax returns, invitations to Atiz California's shareholder meetings, documentation of Atiz Thailand's capital account, or corporate minutes related to Atiz California. Atiz California's sole line of products and sole line of income was through selling Atiz Thailand's units in the United States.

Warnock obtained the book scanners on credit from Atiz Thailand, sold them at a markup, paid Atiz Thailand its retail

3

manufacturing costs, and kept the rest of the profit. Warnock handled all aspects of the distribution in California and all of North America, including attending trade shows and calling and traveling to see potential customers whose inquiries on Atiz Thailand's website were forwarded to him;[2] closing sales with added insurance or warranties at extra cost; clearing scanners from customs; shipping the scanners from Atiz California's warehouse to customers; collecting payments; training customers' staff and helping with installation; troubleshooting any repairs or shipping-related damages; and paying Atiz Thailand.

Atiz Thailand's only role in the sales process was shipping the product and invoicing Warnock and Atiz California; customers directed any complaints to Warnock. Atiz Thailand used United States customers of the product in Atiz Thailand's worldwide marketing. Atiz California, through Warnock, coordinated introductions of potential non-U.S. customers of Atiz Thailand to meet with U.S. customers of the product.

Starting in 2015, Atiz California fell behind on payments and then stopped paying Atiz Thailand its share from sales. Atiz California acknowledged the debts in letters that Warnock signed, and agreed to a payment plan, but discontinued payments after a few months, leaving an outstanding balance of

---

[2] Warnock counted the U.S. Supreme Court, the State Department, Guantanamo Bay, Stanford, U.C. Berkeley, Harvard, Yale, the University of British Columbia, and "prestigious libraries all over the world" as among his and Atiz California's "clients."

$310,038.96 after Atiz Thailand forgave some of the debt. According to Warnock, the quality of the units dropped in 2015.[3]

Still, between 2015 and 2018, Atiz California collected nearly $2.3 million in gross revenue. Around 2016, Atiz Thailand gave its shares in Atiz California to Warnock, making Warnock Atiz California's sole 100% shareholder, in addition to serving as the company's sole officer, director, employee, and decision-maker. According to Warnock, Booppanon explained to Warnock that Booppanon needed to relinquish his shares in Atiz California, without receiving anything in return, because Atiz Thailand had decided to go public in Thailand, In 2018, Atiz Thailand terminated its agreements with Atiz California.

## II. Relevant proceedings below

Atiz Thailand filed the underlying breach of contract action against Atiz California and Warnock in 2019. The complaint did not mention alter ego, alleging only that each defendant was acting as an agent of the other and within the scope of such agency. It also alleged that Warnock filed paperwork with the California Secretary of State attesting that he served as Atiz California's president, CEO, Secretary, and CFO, and was its sole owner.

On April 3, 2019, Warnock filed a demurrer and motion to strike. Warnock argued that the pleading of Atiz Thailand as a foreign corporation was uncertain as to its capacity to sue. The trial court overruled the demurrer on the issue of foreign status and capacity to sue, reasoning that the argument was undeveloped and could be raised as an affirmative defense.

---

[3] The principal of Atiz Thailand's new distributor in the United States and Canada testified that Atiz Thailand's product continued to manufacture "top-quality product[s]."

Trial had been scheduled for March 27, 2020. In January 2020, Atiz Thailand issued third-party deposition and trial subpoenas to defendants' accounting firm, bank, and transactional attorneys seeking production of defendants' financial, tax, accounting, and banking records as well as corporate books and records. Defendants moved to quash or modify the subpoenas for allegedly seeking irrelevant and private information, among other reasons.

On February 26, 2020, Atiz Thailand filed opposition briefs arguing that the subpoenaed records were necessary to pierce the corporate veil under the doctrine of alter ego. The oppositions further detailed that defendants' depositions had made "clear that Warnock, as the sole owner of Atiz [California], is attempting to use the corporation to prevent any recovery by Atiz [Thailand]." Atiz Thailand went on to explain that Warnock had set up Atiz California as a "flimsy organization to escape personal liability," that he took all the money collected by the company for his personal uses, that he undercapitalized the company to pay its creditors, and that the failure to disregard the corporate form under these circumstances would promote injustice. In two of its oppositions, Atiz Thailand argued that "[d]efendants should not be allowed to hinder discovery of facts relating to alter ego liability by refusing to produce the documents themselves . . . and by objecting to . . . subpoenas to third parties" for such documents. The register of actions does not reflect that defendants filed a reply brief.

On March 5, 2020, defendants filed a trial brief arguing that Atiz Thailand failed to plead any alter ego theories against Warnock, that Warnock was "not personally liable" under an alter ego theory, and that Atiz Thailand's failure to register to do

business in California deprived it of standing to pursue its complaint.

In advance of a March 10, 2020 appearance on the motions to quash, the trial court issued an undated tentative ruling partially granting the motion to quash, while stating that Atiz Thailand "plead[ed] an alter ego theory." Consistent with this conclusion, the trial court tentatively modified the deposition subpoenas to limit discovery of Warnock's personal financial records to "financial transactions between Warnock and Atiz [California]" or his "connection/activity with Atiz [California]." The trial court tentatively tailored the deposition and trial subpoenas to defendants' attorneys to materials that "support [Atiz Thailand]'s alter ego theory." On March 10, the parties submitted on the tentative ruling, and the trial court issued a final ruling consistent with it.

Trial was continued to May 7, 2021.[4] In the intervening period defendants did not attempt to address the trial court's statements regarding the complaint's alter ego allegations in its motion to quash ruling. On April 28, 2021, Atiz Thailand filed a trial brief outlining its evidence that Atiz California was Warnock's alter ego, but not addressing the pleading allegations raised in defendants' March 5, 2020 trial brief. On May 3, 2021, the trial court held a final status conference, at which Atiz Thailand's counsel learned from defendants' counsel that defendants had filed their trial brief over a year before. Atiz

---

[4] The record is unclear as to the reason for the continuance, but it is likely that the original March 2020 trial date had to be postponed due to the COVID-19 pandemic. (See *Bullock v. Superior Court* (2020) 51 Cal.App.5th 134, 141 [COVID-19 protocols proper subject of judicial notice].)

Thailand's counsel subsequently reviewed his files and confirmed that he had not received defendants' trial brief, despite a proof of service reflecting March 5, 2020 service on his firm.

Atiz Thailand ultimately received defendants' March 5, 2020 trial brief on May 6, 2021, and filed a trial brief on alter ego liability the same day, also requesting to file an "addendum" to the complaint regarding alter ego liability. Atiz Thailand explained that its agency allegations sufficed to plead alter ego, but also, in an abundance of caution, asked the trial court for leave to amend its pleading to correct any inadvertence. According to Atiz Thailand, such an amendment would not prejudice Warnock as he was named individually in the action, had defended himself and conducted discovery, and was aware of the possibility of individual liability being sought against him under an alter ego theory when he filed his trial brief over a year ago. Declining to permit Atiz Thailand to pursue alter ego liability would be inequitable because Atiz California's bank account was empty and the company had no ability to pay a judgment. The record, including the register of actions, does not reflect an order allowing amendment to the complaint.

The next day, as trial commenced, the trial court overruled defendants' objection that evidence of alter ego liability at trial would be a surprise, and noted that its adjudication of the motion to quash addressed the issue extensively. The trial court informed defendants' counsel that it intended to "hear all of the evidence including if there is an allegation of alter ego . . . so if you're not ready, you need to let me know now because I intend to hear all evidence, including allegations of alter ego." Defendants' counsel stated, without qualification: "We're ready."

At the ensuing bench trial, defendants attempted to counter Atiz Thailand's alter ego allegations in several ways.[5] While cross-examining Booppanon, defendants introduced evidence of Atiz Thailand's accounts receivables and secured an admission that all payments—PayPal transactions possibly excluded— from sales of the book scanners were made by Atiz California, not Warnock. Warnock confirmed that none of the payments were from his personal account, nor did he receive payments personally from Atiz Thailand.

Defendants also introduced, with some success, evidence that Atiz Thailand directed payment requests to Atiz California, rather than Warnock individually. Defendants challenged Booppanon's statements that he did not receive any corporate resolutions or shareholder meeting invitations from Atiz California by unsuccessfully attempting to introduce a corporate resolution and through Warnock's testimony, in effect, that Boopannon signed at least one corporate resolution in 2008.

Warnock also surmised that Atiz California as a C corporation might have sent out Form K-1s listing each shareholder's earnings; that it put Atiz Thailand's capital contribution on the books; and that it would have provided distributions or copies of tax returns, held shareholder meetings or provided ballots for voting on directors if Atiz Thailand or Booppanon had requested such. Warnock disputed commingling

---

[5] A party asserting alter ego must demonstrate (1) a unity of interest and ownership such that the separate personalities of the corporation and the individual(s) no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825.)

funds, denying that he paid personal bills from Atiz California's bank account, otherwise taken money out of it, or put his own money into its account.

After determining that Atiz California failed to pay approximately $310,000 in unpaid invoices, the trial court heard argument as to whether Warnock should be held personally liable for those obligations. As to the first element of alter ego, Atiz Thailand argued that the evidence showed that Warnock, as sole employee, officer, director, and shareholder, used the company in such a way that it had no separateness from himself, observing no corporate formalities, undercapitalizing it, and commingling funds.

Defendants' counsel reasserted that Atiz Thailand had inadequately pleaded alter ego, and the trial court overruled the objection, reminding counsel of his pre-trial assurance that defendants were ready for trial on the issue. Counsel then added that there was nothing unusual for a small company like Atiz California to have Warnock as its only shareholder, officer, director, or decision-maker. Further, the evidence was inconclusive whether Atiz California followed corporate rules governing C corporations because Warnock testified he left such matters to his accountant and attorneys. The trial court indicated that position was unpersuasive because Warnock held all officer positions.

On the second alter ego element, Atiz Thailand argued that Warnock, as Atiz California's sole employee and shareholder and employee, made $2.2 million in gross income during the three years that defendants failed to pay Atiz Thailand's invoices. Allowing him to shield himself from liability and retaining money rightfully belonging to Atiz Thailand would be unjust. In

10

response, defendants argued that Atiz Thailand's mere dissatisfaction as a creditor of a business venture that ultimately did not work out did not suffice for equitable relief. This dispute only arose when problems began with the equipment. Injustice could not be established simply because a corporation does not have the funds to pay a judgment. Rebutting that latter point, Atiz Thailand provided case law establishing the contrary proposition.

The trial court ruled that there was substantial evidence of alter ego liability, finding Warnock's testimony not credible on this issue.

Defendants' counsel then reasserted that Atiz Thailand lacked standing because it did not register as a foreign company authorized to do business in California under Corporations Code section 2105. Atiz Thailand countered that the statute did not apply because it only requires foreign companies to register to conduct *intra*state business in California, not *inter*state or foreign commerce, as was the case with Atiz Thailand. The trial court rejected the standing argument without elaboration.[6]

Warnock timely appealed.

## DISCUSSION

### I.    Standard of review

The parties agree, as do we, that because the two issues framed on appeal involve only application of law to undisputed facts, we apply de novo review. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212–213.)

---

[6] Neither party requested a statement of decision.

11

## II. Atiz Thailand had standing

Warnock contends that Atiz Thailand lacked standing to pursue this action because it failed to register with the state at any point during this matter, as California law requires foreign corporations transacting intrastate business to do before pursuing litigation within its courts. We concur with the trial court that Atiz Thailand was not transacting intrastate business under the meaning of the relevant statutes, and therefore reject Warnock's standing argument.

We begin with the relevant statutory backdrop. A foreign corporation is prohibited from transacting intrastate business without obtaining a certificate of qualification from the Secretary of State. (§ 2105, subd. (a).) A noncompliant foreign corporation risks a number of civil and criminal sanctions, including, as relevant here, that it "shall not maintain any action or proceeding upon any intrastate business so transacted in any court of this state, commenced prior to compliance with [s]ection 2105, until it has complied with the provisions thereof and has paid to the Secretary of State a penalty of two hundred fifty dollars ($250) in addition to the fees due for filing the statement and designation required by [s]ection 2105 and has filed with the clerk of the court in which the action is pending receipts showing the payment of the fees and penalty and all franchise taxes and any other taxes on business or property in this state that should have been paid for the period during which it transacted intrastate business." (§ 2203, subd. (c); see §§ 2203, subd. (a); 2258; 2259.) This requirement serves the important purpose of facilitating service of process, protecting against tax evasion, ensuring fair dealing by foreign corporations, and equalizing the regulation of foreign and domestic corporations. (*Neogard Corp.*

12

*v. Malott & Peterson-Grundy* (1980) 106 Cal.App.3d 213, 219, 223 (*Neogard*).)

Moreover, " 'transact[ing] intrastate business' means entering into repeated and successive transactions of its business in this state, other than interstate or foreign commerce."  (§ 191, subd. (a).)  As another panel of this division previously opined regarding an earlier iteration of this provision, this definition entails "substantial[]" and "continuing" activities within the state.  (*Beirut Universal Bank v. Superior Court* (1969) 268 Cal.App.2d 832, 841; accord, *Detsch & Co. v. Calbar, Inc.* (1964) 228 Cal.App.2d 556, 567 [foreign corporation's activities need not be "entirely" intrastate, only "substantial[ly]" intrastate].)  Whether a corporation's activities satisfy this standard typically hinges upon the particular facts of each case.  (*West Publishing Co. v. Superior Court* (1942) 20 Cal.2d 720, 727.)

However, by statute, a foreign corporation does not transact intrastate business "solely by reason of" seeking sales orders where the orders are accepted outside the state, among other enumerated activities.  (§ 191, subd. (c).)  Importantly, our Supreme Court has interpreted this provision to apply more narrowly than the statute governing service of process, which concerns whether an entity is merely "doing business" in the state.  (*Borgward v. Superior Court* (1958) 51 Cal.2d 72, 76 [legislature "clearly recognized that a corporation may do business in this state without transacting intrastate business"]; see *United Medical Management Ltd. v. Gatto* (1996) 49 Cal.App.4th 1732, 1740 ["[s]ection 2203, subdivision (c) is . . . narrowly construed to effect its remedial purpose"].)

Here, Warnock argues that the California activities of Atiz Thailand—a foreign corporation that was uncontestably never

13

certified to do business within the state—were sufficiently substantial to warrant the conclusion that it was " 'transact[ing] intrastate business' " under section 191, subdivision (a). Specifically, Warnock points to his receiving orders in California as Atiz Thailand's sole North American distributor (including $2.3 million in sales during the last three years of their relationship), Atiz Thailand's shipping most of its North American sales directly to California, their several California-based customers, and that payments for sales flowed through California.

Atiz Thailand counters that it engaged in a singular transaction in California—its agreement with Atiz California, a California company, to exclusively distribute its products within North America. Moreover, that agreement's purpose and effect was for Atiz California to conduct interstate and foreign commerce, which is specifically excluded from section 191, subdivision (a)'s definition of transacting intrastate business. Thus, the activities within California, as well as throughout North America, that Warnock invokes were not attributable to Atiz Thailand, but were "delegated . . . to defendants as its distributors."

Atiz Thailand has the better argument. Boiled down, the *intrastate* activities to which Warnock refers were his and Atiz California's own, not those of Atiz Thailand. While Atiz Thailand was technically a beneficiary of several sales that Warnock and Atiz California completed, Atiz Thailand's only role in those transactions was shipping their product and receiving payments from their location outside of California. Concluding that Atiz Thailand was transacting intrastate business on this basis, as Warnock urges, would directly contravene the statutory exclusion

14

for entities that "[solicit] or procur[e] orders, . . . where [such] orders require acceptance outside this state before becoming binding contracts." (§ 191, subd. (c)(6); see *W. W. Kimball Co. v. Read* (1919) 43 Cal.App. 342, 345 ["Manifestly, the sales, followed by the delivery of the pianos in this state, upon orders sent from this state to the appellant in the state of Illinois, are transactions in interstate commerce and beyond the scope of the statute."]; *Thorner v. Selective Cam Transmission Co.* (1960) 180 Cal.App.2d 89, 91 [no intrastate business where final acceptance of the offer is made outside the state, even when negotiations are carried out within the state by an agent of a foreign corporation]; cf. *Neogard*, *supra*, 106 Cal.App.3d at p. 226 [corporation transacted intrastate business where California activities extended beyond interstate sales contracts, e.g., "induc[ing] contracts between . . . in-state parties" and supervising in-state activities].[7]) This rule applies with no less force to multiple transactions over a span of time, as occurred here. (*Detsch & Co. v. Calbar, Inc.*, *supra*, 228 Cal.App.2d at p. 567.)

The significance of Atiz Thailand's, by its own admission, "delegat[ing]" several apparently intrastate activities to Atiz California does not escape us, especially given the important goals that corporate registration serves. (See *Neogard*, *supra*, 106 Cal.App.3d at p. 226 [considering foreign corporation's "strategic[]" conduct to circumvent registration requirements]; *id.* at pp. 219, 223 [discussing policies undergirding registration requirement].) However, the statutory scheme grants us no

---

[7] Though Warnock's opening brief primarily relied on *Neogard*, *supra*, 106 Cal.App.3d at page 216, he acknowledged that the case was factually distinct in several senses in his reply brief, and we therefore do not address it further.

15

license to disregard corporate formalities, and, in fact, strongly counsels against doing so. (See, e.g., § 191, subd. (b) [foreign corporation not "transacting intrastate business" merely because subsidiary does so or because of its holdings or statuses].)

However, even if we could deem Atiz California as standing in Atiz Thailand's shoes for the purposes of this analysis, a significant portion of Atiz California's sales and activities spanned throughout the continent, not just California, and therefore fell outside the statute's reach. (§ 191, subd. (a) [excluding interstate and foreign commerce from definition of transacting intrastate business].)[8] Moreover, even Atiz California's sales to California buyers had an indispensable international character, given that Atiz Thailand was required to ship its products from Thailand to effectuate every sale. In other words, given the narrow construction we must apply to section 2203, subdivision (c) (*United Medical Management Ltd. v. Gatto, supra*, 49 Cal.App.4th at p. 1740), we are compelled to conclude that Atiz Thailand's intrastate activities were insufficiently "substantial[ ]" to require it to obtain a certificate in order to maintain this action. (*Beirut Universal Bank v. Superior Court, supra*, 268 Cal.App.2d at p. 841.)

---

[8] The precise geographic reach of the transactions giving rise to the $310,000 in unpaid invoices is unclear from the record. (See *Detsch & Co. v. Calbar, Inc., supra*, 228 Cal.App.2d at p. 567 [analyzing corporate activities during period relevant to lawsuit's allegations only].) However, we assume for argument's sake that, like Atiz California's other sales over duration of its relationship with Atiz Thailand, the transactions involved a mix of in-state and out-of-state purchasers.

16

For these reasons, Atiz Thailand had standing to pursue its complaint.

## II.    Warnock has failed to demonstrate any alter ego pleading defect was prejudicial

Warnock further claims that the trial court's imposition of alter ego liability against him was reversible error because Atiz Thailand did not adequately plead alter ego. Because Warnock has failed to demonstrate that any infirmity in Atiz Thailand's pleadings prejudiced him, we reject this argument.

California courts liberally construe complaints, but a plaintiff must at least "set forth the actionable facts relied upon with sufficient precision to inform the defendant of what plaintiff is complaining, and what remedies are being sought." (*Signal Hill Aviation Co. v. Stroppe* (1979) 96 Cal.App.3d 627, 636.) Fairness requires that a defendant have adequate notice to defend a cause of action. (*Bradley v. Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 825.)

Authorities have long been split as to whether alter ego must be pleaded in a complaint. (See *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 413–415 [surveying cases].) Several say that it must be, while others state that a defendant's denial of liability is sufficient to place the alter ego doctrine at issue. (*Id.* at p. 413.) Courts often apply a more exacting standard to pleading deficiencies at the pleadings stage, but excuse such infirmities where a case proceeds to trial, and a defendant has received sufficient notice such that it is not " 'misled to its prejudice by any variance between pleadings and proof. ' " (*Id.* at p. 414.)

We decline to join the alter ego pleadings fray, and instead reject Warnock's invitation to reverse because, even assuming Atiz Thailand was legally obliged to plead alter ego and did not

17

adequately do so, Warnock has not shown that any shortcomings in Atiz Thailand's pleadings sufficiently prejudiced him. In addition to the alter ego specific authorities cited above, the general principle of appellate jurisprudence that we will not disturb a judgment absent an affirmative showing by appellant of prejudicial error is among the most fundamental within this state. (See Cal. Const., art. VI, § 13 [error must result in "miscarriage of justice" to warrant reversal]; see also *In re Marriage of Garcia* (2017) 13 Cal.App.5th 1334, 1344 [appellant "has the burden of establishing prejudicial error"]; *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [California Constitution prohibits reversal due to trial court error unless error was prejudicial].)

Warnock has scarcely attempted to meet that burden, aside from a vague remark that he was prejudiced because, by the time Atiz Thailand filed its trial brief on alter ego the day before trial, discovery was cut off under Code of Civil Procedure section 2024.020. Warnock neglects, however, that, had he required additional discovery on account of this purported new theory, he could have easily sought a continuance of the trial date and a reopening of discovery. (Code Civ. Proc. §§ 2024.020, subd. (b); 2024.050.) In fact, Warnock declined to seek such a remedy when the trial court, prior to the commencement of trial, inquired whether he was prepared to go forward specifically on the alter ego question. To the contrary, his counsel stated that they were "ready."

Moreover, the record, by all indications, corroborates that Warnock was, in fact, "ready." Over a year before trial commenced, the parties litigated the relevance of alter ego when Warnock moved to quash several subpoenas, and the trial court allowed discovery of Warnock's personal finances because it

18

deemed Atiz Thailand to have "plead[ed] an alter ego theory" and that such discovery was necessary to "support" that theory.  This order left no ambiguity that alter ego was at issue, consistent with Warnock's trial brief, filed days before, arguing not merely that alter ego was inadequately pleaded but also that the allegations failed on their merits.  Notably, in 2020, Warnock submitted on the trial court's tentative discovery ruling, and did not attempt to correct the court's purported misapprehensions regarding the pleadings.  Then, approximately one year passed during which Warnock did not seek to conduct discovery, culminating in Atiz Thailand's *two* trial briefs—filed prior to the above-discussed statement of trial readiness—regarding alter ego liability.  Taking this procedural history as a whole, Warnock could not have been in doubt that alter ego was among the issues for trial.

And if this history and Warnock's counsel's own assurances did not alone suffice to counter Warnock's meager claims of prejudice, Warnock's vigorous trial defense of the alter ego allegations settles the question.  Alter ego was the trial's focal point, the primary focus of the parties' witness examinations and their closing arguments.  Warnock has not specified what additional evidence he might have presented or further strategies he might have pursued at trial had Atiz Thailand more specifically pleaded alter ego, and based upon this record, we can discern none.  As such, we cannot say that Warnock was " 'misled to [his] prejudice' " based upon the materials before us.  (*Leek v. Cooper*, *supra*, 194 Cal.App.4th at p. 414.)

For these reasons, Warnock has not shown that Atiz Thailand's alleged failure to plead alter ego was prejudicial error.

## DISPOSITION

The judgment is affirmed.  Atiz Innovation Company Limited is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


RICHARDSON (ANNE K.), J.*

We concur:


EDMON, P. J.


EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.